AKRON, CANTON & YOUNGSTOWN
RY. CO. v. HAGENBUCH et al.

CHAMBERLAIN et al. v. SAME.

Nos. 9111, 9112.

Circuit Court of Appeals, Sixth Circuit.

July 2, 1942.

See, also, 117 F.2d 961.

Paul D. Miller, of New York City (Mudge, Stern, Williams & Tucker, of New York City, Jones, Day, Cockley & Reavis, of Cleveland, Ohio, Paul D. Miller, of New York City, Gardner Abbott, of Cleveland, Ohio, George E. Buchanan and John Wallis, both of New York City, and Robert Crafts, of Cleveland, Ohio, on the brief), for appellants.

Shelton Pitney, of Newark, N. J., George C. Sharp, of New York City, and Andrew P. Martin, of Cleveland, Ohio (Pitney, Hardin & Skinner and Shelton Pitney, all of Newark, N. J., Squire, Sanders & Dempsey, Andrew P. Martin, and H. L. Chapman, all of Cleveland, Ohio, and Sullivan & Cromwell and George C. Sharp, all of New York City, on the brief), for appellees.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

These are appeals by the debtor and its stockholders from an order of the District

Court which, in a proceeding by the Akron, Canton & Youngstown Railway Company (hereinafter called the debtor), under Section 77 of the Bankruptcy Act, 11 U.S. C.A. § 205, confirmed a plan of reorganization which had been approved and certified to the court by the Interstate Commerce Commission as provided under Section 77, sub. d of the Act.

The debtor-appellant, the Akron, Canton & Youngstown Railway Company, in No. 9111 and its stockholders, appellants in No. 9112, attack the plan solely on the ground that the value of $8,500,000 placed on the properties by the Interstate Commerce Commission and approved by the court, is inadequate.

The debtor and its wholly owned subsidiary, the Northern Ohio Railway Company, in April 1933, filed their petitions in the District Court for reorganization under Section 77 of the Bankruptcy Act, which were immediately approved and trustees for the debtors were appointed. On October 30, 1934, the District Court divided the debtors' creditors and stockholders into classes for the purpose of participating in any plan of reorganization and the acceptance thereof. In November 1936, the debtors and their trustees filed separate proposed plans of reorganization with the court and Interstate Commerce Commission as required under the Act. Subsequently, an examiner for the Commission held hearings on the proposed plans and made a report rejecting them and recommending a substitute. The Commission reviewed the Examiner's report on August 12, 1938, and filed with the court a corrected report and amended plan. In its report, the Commission fixed the value of the debtors' properties for capitalization at $8,500,000. When this value was distributed among the debtors, creditors and stockholders, according to their classification and priorities, as theretofore determined by the court, only $6,542 par value of the securities of the reorganized corporation as provided under the plan was available for the debtors' stockholders.

On October 13, 1938, the debtors filed objections to the Interstate Commerce Commission's report and order and moved the court to refer the plan back to the Commission on the ground, among others, that it was unfair to the debtor's stockholders. The court referred the matter to a Master who, after hearing proof, reported on April 15, 1939, that the objections and

exceptions to the Commission's plan should be overruled and the plan approved.

On October 30, 1939, the District Court approved the report of the Master, overruled the objections thereto and approved the Commission's plan and ordered that it be submitted to the stockholders, creditors and security holders by the Commission, which was done. The plan was accepted by all persons authorized to participate therein except the debtors' stockholders and the court set a hearing on it for March 27, 1941, with due notice to all parties. The debtors' stockholders filed with the District Court an application for rehearing and moved that the plan be referred back to the Commission. After hearing proof, the District Court, on June 12, 1941, confirmed the plan and overruled the stockholders' motion to refer it back to the Commission. From this order the debtors and their stockholders, appellants herein, have appealed.

The sole objection to the court's order is that the value of the debtors' properties as fixed by the Interstate Commerce Commission was less than their fair value and if said properties were correctly valued, the stockholders of the debtors would be entitled to a greater par value of the securities of the newly reorganized corporation.

In other words, appellants insist that the fair value of the debtors' properties as a going concern is greatly in excess of all their liabilities and that the capitalization provided for in the plan approved by the court deprives them of valuable property rights without compensation, and in violation of due process.

The report of the Commission comprises a history and description of the properties of the debtors and also a list of their creditors. It also refers to a valuation of the debtors' properties made under Section 19a of the Interstate Commerce Act, 49 U.S. C.A. § 19a, as of June 30, 1918, for rate making purposes and shows additions and betterments to December 31, 1935, which aggregate a total value of $8,817,572. It is stated in the report that a witness for the debtors, after a brief inspection of the properties and after an examination of the debtors' records, testified that the properties were in good physical condition but that the trustees' Chief Engineer in charge of maintenance of way and structures for some years testified that the debtors' properties were only in fair physical

condition and also stated that 95 of the 171.3 miles of the debtors' main tracks rested on 6 inches of stone ballast which would have to be increased to 12 inches if their traffic load was to be economically handled.

The report also showed the debtors' traffic aggregated 1,939,939 revenue tons in 1935 and 1,648,258 revenue tons for the first nine months of 1936, 54% of the tonnage in 1935 consisting of mine products and 38.5% consisting of manufactured products and miscellaneous tonnage. The Commission's report also showed that since 1928, the debtors had suffered a decline in freight tonnage, which was most severe in 1932, and had suffered a permanent diversion of their freight tonnage to pipe lines, tank ships and trucks and that according to the testimony of the witnesses for the trustee, it was doubtful that the debtors would ever recover any great proportion of the business which had been diverted to trucks.

The report also showed that during the nine year period 1928-1936, the debtor, the Northern Ohio Railway Company's operating revenues and operating expenses averaged annually $1,072,011 and $759,809 respectively. For the same period its gross income averaged annually $319,149 and its average annual earnings available for interest on funded and unfunded debts were $131,977. During the same period, the debtor, the Akron, Canton & Youngstown Railway Company, averaged annually operating revenues of $1,274,299 and incurred average annual operating expenses of $756,705 and an average gross income of $562,120. During this period its average annual earnings available for interest on its funded debt as shown by its books were $440,994, which sum included uncollectible interest accrued on notes of the Terminal Properties Company and also on general mortgage bonds of the Northern Ohio Railway Company which averaged $68,532 annually. Eliminating the uncollectible interest items, the Akron's average annual net income for the period was $147,426. For the nine year period 1928-1936 the consolidated net income of both debtors averaged annually $197,074 and when uncollected interest was eliminated, the average annual net income was $152,196.

The Commission also found that "If the consolidated income were further adjusted for delayed debits and credits of income items to profit and loss, and to reflect the application of tax laws in effect during the year 1936, the elimination of emergency charges, and the elimination of percentage reductions in wages, as testified to by a witness for the trustees, the constructive income available for interest, capital requirements, and all corporate purposes would be shown as $358,688 in 1926, $471,219 in 1927, $563,265 in 1928, $785,507 in 1929, $457,532 in 1930, $196,246 in 1931, $64,310 in 1932, $228,115 in 1933, $211,128 in 1934, $60,383 in 1935, and $426,519 in 1936, or an average for the period of $347,536."

The Commission stated that as a basis for forecasting future earnings of the debtors, a witness for the trustees estimated operating revenues at $2,300,000 for 1937, $2,400,000 for 1938, $2,500,000 for 1939, $2,500,000 for 1940 and $2,300,000 for 1941 and that during the period from 1928-35, operating revenues averaged annually $2,356,428. The 1937 estimate represented an increase of $125,000 after elimination of $90,000 received in 1936 from an emergency fund, thereafter discontinued. For the 1937-41 period, the trustees estimated annual operating expenses at $1,475,800, $1,577,000, $1,650,000, $1,650,000, and $1,463,000 respectively, the 1937 estimate being about $54,000 less than the annual average for the 1928-35 period and an increase of about $65,000 over 1936. The trustees estimated that the earnings available for interest and dividends were $438,742, $390,092, $397,142, $397,192 and $408,242 for the years 1937 to 1941 respectively. A corresponding estimate of the debtors arrived at by adjusting the trustees' estimates in accordance with certain of the debtors' contentions showed $459,242, $445,092, $473,142, $473,192 and $464,242. No other evidence was considered or heard by the Commission relating to earnings and dividends.

The Commission's Bureau of Accounts filed with the Commission a report of the net income of the debtors for the years 1930-1934, inclusive, which showed that after certain adjustments were made that the average net income of the Akron for the five-year period was $222,678 and of the Northern $66,628. The Commission found that the capitalizable assets of the two companies with inter-company items eliminated were approximately $13,982,391 computed in accordance with the principles announced in Securities of Louisville

& Nashville Railroad Company, 76 I.C.C. 718. The rule announced in this case was that capitalizable assets represented those assets of the carrier which had been provided and which were intended for continued productive use as shown by the books of the carrier. The Commission also incorporated in its report the balance sheets of the debtors as of September 30, 1936. It also analyzed the debtors' plan of reorganization and the plan submitted by the trustees and stated wherein the Commission believed these plans to be unfair and inequitable.

The Commission proposed a capitalization of the successor company as of October 1, 1938, which proposal is found in the margin.[1]

Appellants at the hearings before the Master and the District Court on their objections to the Commission's plan, introduced a statement of the actual earnings of the debtors available for interest, the actual interest charges and the balance of the earnings available for dividends for the years from 1926 to and including ten months of 1941, which is found in the margin.[2]

This data was considered and weighed by the Commission except for the period from 1937 to and including the ten months in 1941.

Appellants urge that the Commission failed to observe two procedural requirements under the Bankruptcy Act: (1) That it made no findings of fact; (2) that its ultimate conclusion as to the value of the assets is without substantial supporting evidence.

The Commission in its report does not expressly adopt or reject any of the evidence relating to the valuation of the debtors' assets, nor does it point out any method followed by it in determining the value of the railroad property in question and save for the Commission's statement "From a consideration of the entire record, including the elements of value referred to, and the earnings and prospective earnings, and especially the impairment and earning power of the properties, we conclude and find that the equity of the stockholders has no value, or none other than or in excess of that represented by such conditional class B warrants," the grounds of its determination are not set forth.

---

[1] Undisturbed

| | |
|---|---|
| Trustees' Certificates, 4 per cent | $ 266,000 |
| Equipment trust of 1926, 4½ per cent. | 40,000 |
| Equipment lease of 1936, 4 per cent | 18,500 |
| New Issues | |
| Consolidated mortgage bonds, 4 per cent, series A | 1,500,000 |
| Consolidated mortgage bonds, 4½ per cent, series B | 2,173,000 |
| Preferred stock, 5 per cent | 2,203,800 |
| Common stock, issued and outstanding | 1,614,910 |
| Common stock, issued and held in treasury | 683,790 |
| Total | $8,500,000 |

[2]

| Year | Earnings available for interest | Interest charges | Available for Dividends |
|---|---|---|---|
| 1926 | $ 468,261 | $ 300,502 | $ 167,759 |
| 1927 | 603,776 | 313,881 | 289,895 |
| 1928 | 754,770 | 335,810 | 418,960 |
| 1929 | 1,042,752 | 344,865 | 697,887 |
| 1930 | 603,987 | 348,185 | 255,802 |
| 1931 | 270,060 | 346,220 | D 76,160 |
| 1932 | 240,262 | 355,288 | D 115,026 |
| 1933 | 352,997 | 357,306 | D 4,309 |
| 1934 | 325,537 | 355,219 | D 29,682 |
| 1935 | 414,272 | 353,132 | 61,140 |
| 1936 | 517,757 | 356,607 | 161,150 |
| 1937 | 351,336 | 364,956 | D 13,620 |
| 1938 | 116,122 | 361,090 | D 244,968 |
| 1939 | 335,053 | 357,592 | D 22,539 |
| 1940 | 498,029 | 357,023 | 141,006 |
| 1941 (ten mos. only) | 620,641 | 301,290 | 319,351 |
| Totals 15⅚ years: | $7,515,612 | $5,508,966 | $2,006,646 |
| Average per year: | 474,670 | 347,935 | 126,736 |

D denotes deficit.

It is the duty of the Commission to certify the plan to the court, together with a transcript of the proceedings before it and a copy of the report and order approving the plan. Section 77, sub. d, 11 U.S.C.A. § 205, sub. d.

■■■ Such report should contain the Commission's findings of fact as to the plan and its recommendation thereon. The report should not be made up of mere conclusions, but should show the issues between the parties to the reorganization and the facts the Commission finds with reference to them. The Commission should also make appropriate references to the evidence, but the report need not specify the weight given to any particular part thereof or disclose the mental operations by which the decision is reached. The report must be considered in its entirety and not any isolated statements therein. Baltimore & O. Railroad Company v. United States, 298 U.S. 349, 359, 56 S.Ct. 797, 80 L.Ed. 1209. The Commission's report should contain its findings of fact and such findings must be consistent with the evidence. The findings of fact may be informal and need go no further than the ultimate facts. United States v. State of Louisiana, 290 U.S. 70, 80, 54 S.Ct. 28, 78 L.Ed. 181; Mills v. Lehigh Valley Railroad Company, 238 U.S. 473, 480, 35 S.Ct. 888, 59 L.Ed. 1414.

■■■ There is implicit in the Commission's determination that the total capitalization of the debtors could not exceed $8,500,000, a finding of an ultimate fact that the fair market value of the capitalizable assets of the debtors was that sum and no more. It seems from the report of the Commission that it arrived at this valuation by estimating the debtors' annual average net earnings available for interest and dividends for the years from 1937 to and including 1941, at $425,000 and capitalized this sum at 5%. In our opinion, the Commission's findings were sufficient.

Appellants insist that, assuming that the Commission did find a valuation of $8,500,-000, such valuation is not supported by the evidence for the following reasons:

1. That the Commission gave undue weight to the debtors' past, present and prospective earnings and in so doing greatly underestimated prospective earnings.

2. That, although the Commission found as an evidentiary fact that the debtors had capitalizable assets or an actual investment in their properties of $13,982,391 and determined the reproduction cost of the debtors' property to be $8,917,572, it ignored these criteria of value in making its final determination.

3. That the rate of 5% used by the Commission to capitalize the earnings of the debtors was too high.

In considering appellant's contentions, it is important to have in mind the objects and purposes of the Bankruptcy Act in question.

Section 77, sub. e, 11 U.S.C.A. § 205, sub. e, provides that where it is necessary to determine the value of any property for any purpose under this Section, the Commission shall determine such value and certify it to the court in its report on the plan, and provides that the value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present and prospective and to all other relevant facts.

■■■ In determining such value, only such effect should be given the present cost of reproduction new and less depreciation, and original cost of the property and the actual investment therein, as may be required under the law of the land in the light of its earning power and all other relevant facts.

Prior to the enactment of Section 77 of the Bankruptcy Act, as amended, the capital structure of railroads was top-heavy with fixed indebtedness and the Congress recognized that the public had a practical interest in the matter of the capital structure of railroads to the extent that an unduly high ratio of fixed interest obligations to the capital structure of such carriers impaired their credit and their ability to provide the most economical and efficient public service. It also recognized there was danger in a high percentage of funded debt because it imposed an inflexible burden in fixed charges and brought financial disaster to railroad carriers when earnings dropped. (Senate Document 119, 73 Congress, 2d Session, 1934-4-7.)

The Congress also recognized that the controlling question in railroad reorganization was what can the property earn to support its capital structure, and report No. 454 of the Senate Committee on Interstate Commerce issued on May 18, 1939, contained the following: "It would be

tantamount to fraud to create worthless securities in reorganizations, securities that cannot be reasonably expected to be supported by earnings. That would be simply creating tokens for stock market speculation."

Most railroads are an enormous aggregation of capital, labor and other vested interests and so many livelihoods are involved in them and the public is so vitally interested in their continued operation and the replacement of obsolete equipment and their physical rehabilitation that the Congress concluded it was unsafe to entrust railroad securities in a reorganization to the caprice of a wholly free market or railroad rehabilitation to the procedural delays of equity reorganizations or liquidations. (Moulton and Associates, The American Transportation Problem, 1933.) Continental Bank v. Chicago, Rock Island Railroad, 294 U.S. 648, 685, 55 S.Ct. 595, 79 L.Ed. 1110.

Section 77 expresses the public policy which led to its enactment and demands the continuation of railroads for the benefit of the public regardless of the interests of stockholders and creditors. (Report No. 454 of the Senate Committee on Interstate Commerce, issued May 18, 1939.) It is clear from the history and language of the Act in question that it was the purpose of the Congress that in valuation of property under the Act, earning power was to be the primary factor. Section 77, sub. c(4), 11 U.S.C.A. § 205, sub. c(4), mandatorily requires that the plan shall reduce fixed charges so that there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof.

Appellants concede that under Section 77, sub. e, the primary test of value is earnings, but insist that physical asset values on various bases such as actual investment and present cost of reproduction must be given due consideration in order to avoid unconstitutional confiscation of property. Ascertainment of value is not controlled by artificial rules, nor is it a matter of formulas. Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 434, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18. When evidence of value is weighed on the finest scales justice can devise, the result even then is no more than an approximation.

Valuation of Railroad property under the express terms of the present act is not primarily a judicial function and the courts, in reviewing the valuation of the Commission, should exercise care not to unduly interfere with the discretion confided to this trained body. There should be no arbitrary or capricious exercise of the Commission's functions, as quasi judicial discretion like judicial discretion, should remain within legitimate limits. Valuation under the Act is an intensely practical matter in which there is room for the exercise of judgment and discretion, much of which must be left to the knowledge and experience of the members of the Commission. The present Statute contains equivocating statements which cannot be ignored by the court when reviewing the Commission's valuation.

When the Statute was enacted there were extant legally recognized, evidential factors for determining the value of the operating properties of railroads, for the purpose of taxation and rate making considering the system as a unit and it is clear from the use of the phrase in the Act "required under the law of the land" that the Congress did not intend that the Commission should ignore any criteria of value then judicially recognized. One of the methods of valuation having judicial approval was to average market quotations of the stocks and bonds of the utility over a more or less arbitrary period of time and to multiply this average by the total number of outstanding units of each class of securities. Without discussing the evidentiary value of this method, had it been applied in the present case the result would have been a much lower value than the total sum found by the Commission. Therefore, appellants cannot complain if the Commission failed to give due weight to this method.

Another recognized method is the cost of reproduction less depreciation. The valuation of the properties in question would have been greatly in excess of that found by the Commission if this method had been used. It is familiar learning that reproduction cost less depreciation is a very important element in ascertaining the value of corporate property for rate making purposes. Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819. In valuing a railroad for rate making purposes, the first inquiry usually is as to the actual investment in the property, but if it appear that this was in excess of the necessary cost, the latter is the proper standard

and if it further appear that the net income of the road does not equal current rates of interest on its necessary costs, or if the business is likely to be destroyed or impaired by competition or other causes, or if the utility of the road is not equal to its cost, then its value is less than its cost and must be determined with reference to its utility alone, even in rate cases. Federal Power Commission and Illinois Commerce Commission v. Natural Gas Pipeline Company of America and Texoma Natural Gas Company, 62 S.Ct. 736, 86 L.Ed. —, decided by the Supreme Court March 16, 1942.

It has been demonstrated by the course of economic history in the United States during a long period that generally speaking, reproduction cost of railroads has no proper relation to the fair market value of the property. Construing the present Act in the light of its purpose as applied to this case, the only pertinent value to be determined is that either upon an assumed sale or exchange of the property as a going concern. Under the facts appearing in the Commission's report, the cost of reproduction is to be given little weight, if any, in determining actual value. Atlanta, Birmingham & Coast Railroad Company v. United States, 296 U.S. 33, 39, 56 S.Ct. 12, 80 L.Ed. 25.

The law also recognizes capitalization of net operating income as an important element in ascertaining the value of railroad property for the purpose of reorganization. Under this method the net railroad operating income is averaged over some more or less arbitrary period which, under the concept of the present statute, should include years of the debtors' lowest probable earnings as well as those of the highest. Usually it is not difficult to ascertain the net operating earnings of railroads but it is not always easy to fix the test period because of variable general business conditions which affect freight tonnage. Car loadings decline in periods of depression and conversely increase in eras of prosperity. Under a war economy, car loadings usually increase to the maximum capacity of the road. Earnings are usually the measure of value at every step of railroad financing. A prospective investor looks to the value of the railroad as a going concern, as he recognizes that the most effective security for a railroad loan lies in the earning value of the property. The evidence before the Commission

showed that the debtors for the five year period, 1926–1930, inclusive, had average earnings available for interest and dividends of $694,709 and for the period, 1931–1935, inclusive, $320,626. For 1936, the earnings were $517,757; for the period 1937 to and including 1941, the Commission estimated prospective annual earnings at an average of $425,000. Average annual earnings for this period were $398,215.40.

Appellants lay great stress on the fact that for 1940 the debtors earned $498,029 and that for twelve months ending October 31, 1941, the earnings available for interest and dividends were $732,190. It is conceded that these abnormal increases are solely attributable to the prosecution of the war effort of the Government. These abnormalities are not proper tests by which to measure the Commission's determination of the somewhat imponderable prospective earnings in 1937. Subsequent earnings due to unforeseeable circumstances may not be used to check the correctness of prospective earnings as determined by the Commission under the Act. Naturally such earnings could not have entered into any purchaser's estimate of value.

There is no rigid formula known to the law for the rates to be used in capitalizing net earnings as an evidence of value. The rate that should be used is such a one as will have a reasonable tendency to maintain the securities issued against the capitalization at par. The rate of capitalization depends in part upon the date as of which the value is to be determined and the temper of the financial market at that time. What is a reasonable rate of return is a question of fact and in the light of the price at which railroad securities were selling in relation to railroads' earnings in 1937, it could hardly be said that a return of five percent would have kept such securities at par.

Recognizing the evidentiary difficulties inherent in the conversion of property values into monetary terms, in our opinion the Commission adjusted the values of the property in question to the exigencies of the business world and its value is supported by substantial evidence.

Appellants urge that it was the duty of the District Court to exercise an independent judicial judgment in fixing the value of the debtors' properties and that it erred in failing to find as a fact that the value of the debtors' property was in excess of

$8,500,000 based on the evidence not only before the Commission, but that heard by the Special Master and by the Court.

Section 77, sub. e of the Act, 11 U.S.C. A. § 205, sub. e, provides that no plan certified to the District Court by the Commission "may be approved" unless the Judge "after a hearing if objections are filed" is "satisfied" that the plan " * * * if fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; * * *."

■ ■ The duties imposed on the courts and the powers conferred on the Interstate Commerce Commission under this Section of the Act, when construed in relation to other Sections, are separate and distinct. As to some matters under the Act, such as the determination of value, a broad discretion is lodged in the Interstate Commerce Commission and the court does not sit as a board of revision to substitute its judgment for that of the Commission. In such matters, the judicial inquiry into the facts goes no further than to ascertain whether there is substantial evidence to support the findings of the Commission and the question of the weight of the evidence in determining such matters lies with the Commission when acting within its statutory authority. Palmer v. Commonwealth of Massachusetts, 308 U.S. 79, 87, 60 S.Ct. 34, 84 L.Ed. 93. Section 77, sub. d, 11 U. S.C.A. § 205, sub. d, provides that the Commission "shall approve a plan * * * that will in its opinion meet with the requirements of subsections (b) and (e) of this section, and will be compatible with the public interest." Similar terms are found in paragraph (2) of Section 20a and paragraph (3) of Section 5 of the Interstate Commerce Act, 49 U.S.C.A. §§ 5(3), 20a(2), which were in effect before the passage of the Act in question. The validity of the Act conferring such power on the Commission was approved in New York Central Securities Corporation v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.Ed. 138. Historically, the power to value railroad properties for rate making and capitalization purposes has always been lodged in the Interstate Commerce Commission.

There is nothing in the present Act which would indicate that the Congress intended to deprive the Commission of any of the powers it had so long exercised in valuing railroad properties for capitalization purposes.

■ The determination of the value of the properties, and the amount and character of capitalization, are legislative functions affecting the public interest and are exclusively within the province of the Commission under the Act. The only qualification is that the court shall independently determine whether, in the exercise of its jurisdiction, the Commission has acted fairly within the bounds of the Constitution and not arbitrarily.

Decree affirmed.