## UNITED STATES ET AL. *v.* LOUISIANA ET AL.

No. 17. Argued October 13, 1933.—Decided November 6, 1933.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Biggs* and *Messrs. Elmer B. Collins* and *Nelson Thomas* were on the brief, for the United States and Interstate Commerce Commission, appellants.

*Messrs. J. Blanc Monroe* and *Harry McCall* submitted for the Texas & New Orleans R. Co. et al., appellants.

*Mr. Wylie M. Barrow,* Special Assistant to the Attorney General of Louisiana, with whom *Mr. Gaston L. Porterie,* Attorney General, was on the brief, for appellees.

Mr. Justice Stone delivered the opinion of the Court.

This is an appeal under the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 219, 220, Judicial Code, § 238, from a final decree of a District Court, of three judges, for Eastern Louisiana, which made permanent an interlocutory decree staying an order of the Interstate Commerce Commission. The order directed the removal of unjust discrimination against interstate commerce resulting from intrastate rates maintained by rail carriers

in Louisiana, by prescribing an increase in intrastate rates on specified commodities, in amounts equal to increases in interstate rates on the same commodities, established by appellant carriers under the authority of an earlier order of the Commission in the Fifteen Per Cent Case, 1931. 178 I.C.C. 539; 179 I.C.C. 215.

In the Fifteen Per Cent Case the Commission, acting under § 15a (2) of the Interstate Commerce Act, after an extensive hearing, granted permission to the carriers of the country to add a surcharge to established rates in amounts varying with different commodities but not exceeding in any case 10% of the basic rate. Thereupon the railroads of the country, including those operating in Louisiana, added the permitted surcharges to their interstate rates and most states authorized like increases in their intrastate rates. Others failed to increase the intrastate rates, and the State of Louisiana by its Public Service Commission refused to allow the increase on some thirty-seven commodities and on all less-than-carload lots. The carriers filed petitions invoking the exercise of the power of the Commission under § 13 (3) and (4) of the Interstate Commerce Act to remove undue discrimination by those intrastate rates against interstate commerce. This proceeding, after an extended investigation and hearings by the Commission, resulted in the order challenged here. Increase in Intrastate Rates, 186 I.C.C. 615. It requires the carriers to charge, upon specified commodities and all less-than-carload lots in intrastate commerce in Louisiana, " rates which shall be not lower than the rates now in force and applicable to the intrastate transportation of said traffic within the State of Louisiana, plus the surcharge authorized by the findings in the Fifteen Per Cent Case . . . on corresponding interstate traffic, so long as such surcharges are maintained. . . ."

In setting aside the order, the court below rested its decision upon the inadequacy of the Commission's find-

ings. It thought that as the Commission, in the Fifteen Per Cent Case, 1931, did not find that the several interstate rates resulting from the authorized surcharges would each be just and reasonable, there was no basis for raising the intrastate rates under § 13 (3) and (4), see *Florida* v. *United States*, 282 U.S. 194; cf. *Georgia Pub. Serv. Comm'n* v. *United States*, 283 U.S. 765, and that the order could not be supported as a revenue measure because there were no findings that the increased rates would produce an increase in carrier income. It is also argued here that the order assailed is invalid because the Commission, in its earlier order, did not require the carriers to increase their rates interstate, but only permitted them to do so at their option.

1. The Transportation Act of 1920, by § 416, 41 Stat. 484, §15a (2) Interstate Commerce Act,[1] for the first time laid on the Commission the affirmative duty to establish rates for interstate rail carriers

" . . . so that carriers as a whole (or as a whole in each of such rate groups or territories as the Commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income equal,

---

[1] " Sec. 15a (2). In the exercise of its power to prescribe just and reasonable rates the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole (or as a whole in each of such rate groups or territories as the Commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures, and equipment, earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation: *Provided*, that the Commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different sections of the country."

as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation: . . ."

See *Wisconsin Railroad Comm'n* v. *C., B. & Q. R. Co.,* 257 U.S. 563; *Dayton-Goose Creek Ry.* v. *United States,* 263 U.S. 456; *New England Divisions Case,* 261 U.S. 184, 189. Associated provisions calculated to preserve carrier income in the interests of an efficient transportation service were those empowering the Commission to permit pooling of traffic and earnings, § 407, § 5 Interstate Commerce Act, and to fix minimum, as well as maximum rates, § 418, § 15 (1) Interstate Commerce Act, to preclude the absorption of traffic of weaker competitors by cut-throat competition. See *New England Divisions Case, supra,* 190.

Under earlier acts the Commission had been given power to remove unjust discrimination in rates or service between shippers or localities, § 2 Act of February 4, 1887; 24 Stat. 379, 380; § 3 Interstate Commerce Act; and rates in interstate commerce were required to be reasonable " in the sense of furnishing compensation for the particular service rendered and the abolition of rebates." *Wisconsin Railroad Comm'n* v. *C., B. & Q. R. Co., supra,* 585; § 1 Act of 1887; § 4 Act of 1906; 34 Stat. 589; § 15 Interstate Commerce Act. Under these acts the Commission had the power to order the carriers to desist from discrimination against interstate shippers by intrastate rates, *The Shreveport Case,* 234 U.S. 342, but until the Transportation Act it was without authority to prescribe intrastate rates.

By § 416 of the Transportation Act, § 13 (4) Interstate Commerce Act, directly involved here, the Commission was given power to remove unjust discrimination by intrastate rates against interstate commerce, by prescribing minimum intrastate rates.[2] This Court has consist-

---

[2] Section 13 (4): " Whenever in any investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage,

ently held that this section is to be construed in the light of § 15a (2) and as supplementing it, so that the forbidden discrimination against interstate commerce by intrastate rates includes those cases in which disparity of the latter rates operates to thwart the broad purpose of § 15a to maintain an efficient transportation system by enabling the carriers to earn a fair return. So construed, § 13 (4) confers on the Commission the power to raise intrastate rates so that the intrastate traffic may produce its fair share of the earnings required to meet maintenance and operating costs and to yield a fair return on the value of property devoted to the transportation service, both interstate and intrastate. *Wisconsin Railroad Comm' n* v. *C., B. & Q. R. Co., supra,* 586, 587, 588, 589, 590; *New York* v. *United States,* 257 U.S. 591, 601; *Florida* v. *United States, supra,* 211; *Louisiana* v. *United States,* 284 U.S. 125, 131; see *Nashville, C. & St. L. Ry. Co.* v. *Tennessee,* 262 U.S. 318.

As pointed out in the reports of the Commission in this case and others (see Increased Rates, 1920, 58 I.C.C. 220; New York Passenger Fares, 59 I.C.C. 290), § 15a, by its terms, commands the Commission, in providing the required revenue by increasing rates, to deal with the carriers of the nation as a whole or in broad classes, and as this Court recognized in the *New England Divisions Case, supra,* 197, 198, this requirement would be nullified and the administrative arm of the Commission paralyzed, if

---

preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice or discrimination. . . ." (41 Stat. 456, 484.)

instead of adjudicating upon the rates in a large territory on evidence deemed typical of the whole rate structure, it were obliged to consider the reasonableness of each individual rate before carrying into effect the necessary increased schedule.

It cannot be supposed that Congress, in placing this duty on the Commission, intended, in the absence of some express provision compelling it, that the Commission should follow a procedure which would preclude its acting effectively, if at all. That such was not its intention appears from the words of the statute. It does not, in terms, command the Commission to find that each rate prescribed under § 15a is just and reasonable, as prerequisite to a general increase in rates. It provides only that the action of the Commission in raising rates so that they may yield a fair return is to be " in the exercise of its power to prescribe just and reasonable rates," with the qualification, in the proviso to the granted authority to increase rates, " that the Commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable. . . ." When read in the light of the subject matter to which the section is to be applied, the production of increased revenue by a nation-wide or group increase of rates, it is apparent that these provisions cannot rightly be construed to require the Commission as a condition of any action by it to find the reasonableness of each individual rate. If the Commission were required to do that, there would be no occasion for the granted latitude to modify those rates found to be unjust or unreasonable.

The natural construction of the section, one consistent with its language, and making possible its practical operation, is that which has uniformly been given to it by the Commission. Section 15a (2) does not relieve the Commission from the responsibility of seeing to it that the rates as increased are to be reasonable. But in perform-

ing the duty broadly to increase carrier revenue, it is enough if the Commission, in the first instance, makes such inquiry and investigation as would enable it to say that the prescribed increases when applied to members of the group will generally not exceed a reasonable maximum. The extent of this inquiry and the detail of investigation can not be marked by this Court with certainty. The size of the group dealt with, the nature of the traffic, the urgency of the relief demanded, these and other factors should condition the Commission's procedure in each case. But with proper procedure, the ultimate finding that the rates as generally applied are reasonable, supported by evidence and accompanied by suitable reservation of the rights of all interested parties to secure modification of any particular rate which, when challenged, is found to be unjust or unreasonable, complies with the statute. The requirement that increase of rates by Commission action is to be in the exercise of its power to prescribe reasonable rates is thus observed but in conformity to the administrative necessities which the proviso contemplates.

In the Fifteen Per Cent Case, 1931, the Commission, after a careful survey, found itself faced with an acute emergency calling for prompt action to give temporary financial relief to the transportation system. The Commission's report amply discloses that the reasonableness of the rates as generally applied was a controlling consideration in fixing the varying amounts of the surcharges and in selecting the particular items to bear them. This is manifested in its conclusion that " the freight articles selected by us in this connection were those for the transportation of which we believed the rates could be somewhat increased without causing the traffic to be transferred to other agencies of transportation and without bringing about an undue disturbance in business conditions or transgressing the bounds of maximum reasonable

rates." It was necessary, under the circumstances, that the increases take effect without suspension, but this was done subject to the proviso that " the resulting rates will in all respects be subject to investigation and determination as to the lawfulness of particular rates or schedule of rates, as provided by the Act." The Commission's action complied with § 15a; see *New England Divisions Case, supra,* 197.

In proceeding under § 13 (3) and (4) to make the order, challenged here, the Commission made no express finding that the increased intrastate rates would be reasonable, but incorporated the findings bearing on the reasonableness of the increased interstate rates made in the Fifteen Per Cent Case, 1931. Although § 13 (4) does not in terms require the Commission to find that the intrastate rates which it prescribes are reasonable, it is not questioned that the section confers no authority on the Commission to require intrastate rates to be raised above a reasonable level, see *Georgia Pub. Serv. Comm'n* v. *United States, supra,* 770; *Florida* v. *United States, supra,* and the appellees insist that the order is defective because, in conforming the intrastate rates to the reasonable level of interstate rates, the Commission did not find specifically that in each case the rate as increased would be just and reasonable. But we think that the relationship of the section to § 15a (2), already described, is such that the standard of reasonableness prescribed by the latter is that necessarily set up for § 13 (4) which supplements it. The considerations already detailed which define that standard for § 15a necessarily define it for § 13 (3) and (4), which creates a duty in " dovetail " relationship to that imposed on the Commission by § 15a. *Wisconsin Railroad Comm'n* v. *C., B. & Q. R. Co., supra,* 386. The administrative difficulties which would preclude performance of the duty imposed by § 15a if the Commission were required to find that each individual rate prescribed is just and reasonable,

would similarly prevent compliance with that under § 13 (4). Since neither can be performed effectively without performance of the other, the standard of reasonableness to which the Commission must conform is necessarily the same under both, and that implies that under § 13 (4), as under § 15a (2), reasonable latitude must be given for modification of particular rates found to be unreasonable.

The case of the Louisiana rates was not alone before the Commission, and it should not be treated as though it were. A number of other states, contesting in the aggregate a wide range of rates, were heard at the same time. Had the Commission been required to go into the circumstances of each item with particularity the purpose of its original order would have been defeated. It sufficed that the Commission found that Louisiana showed nothing in the circumstances of its agriculture and industry or its traffic conditions so different from the rest of the country as to lead to the conclusion that the intrastate rates, raised to the reasonable general interstate level, would not themselves be reasonable; and that it saved the rights of interested parties to test the reasonableness of any individual rate.

A question different from that before us was presented in *Florida* v. *United States, supra.* There the discrimination was essentially one of undue prejudice against shippers, confined by the evidence to rates prevailing in northern Florida. It involved only one railroad and one commodity. It was not the general revenue proceeding authorized by § 15a. The Court was careful to point out that the Commission had undertaken to establish a state-wide level of intrastate rates without any findings with respect to the corresponding interstate traffic which would tend to support the conclusion that a state-wide alteration of intrastate rates was necessary to protect the interstate commerce involved.

2. The objection that the finding of unjust discrimination by the intrastate rates against interstate commerce is unsupported by any finding that the increased rates would produce increased revenue is rested upon the statement, separated from its context in the Commission's report, " we conclude that no positive finding in regard to the revenue outcome of the increases can be justified." It is manifest that any finding of undue prejudice to interstate commerce, based upon the failure of prevailing intrastate rates to contribute their fair share to the support of a national transportation system, must necessarily rest upon a prediction that an increase of the intrastate rates will result in an increase of revenue, a prediction involving, especially since 1930, many elements of uncertainty. There are no formal requirements for the findings to be made by the Commission in this type of case, see *Manufacturers Ry. Co.* v. *United States*, 246 U.S. 457, 490, and while the particular form in which they were cast here is not to be commended, the report, read as a whole, sufficiently expresses the conclusion of the Commission, based upon supporting data, including estimates of experienced railroad traffic men, to which the report refers, that the probability of increased revenue was sufficiently great to make the increase of rates a reasonable exercise of sound managerial judgment. This, we think, meets the requirements of the statute.

In the Fifteen Per Cent Case, 1931, the Commission had said: " The plan outlined in the appendix we estimate will produce between one hundred million and one hundred and twenty-five million dollars' increased revenue on the basis of present traffic, if applied both state and intrastate." And in the proceeding resulting in the present order it said: " We find that in view of the surcharges which have become effective interstate, in the freight rates on the classes and commodities here in question, under our findings in Fifteen Per Cent Case,

1931, *supra,* respondents' intrastate rates in Louisiana on the same classes and commodities, to which no corresponding surcharges have been added, have resulted and will result in unjust discrimination against interstate commerce, except in the case of intrastate rates on sugar cane." This finding could only mean, when applied to the question in hand, that the intrastate traffic was not bearing its fair share of the burden of maintaining a national transportation system, by contributing such increased revenue as would result from an increase in rates. This the Commission proceeded to point out in detail when it said further: " It is estimated that, based on the traffic of 1931, the application of the surcharges on the excepted commodities would produce additional annual revenue " in substantial amounts named with respect to each of the carriers participating in the traffic, and continued, saying: "Railroad traffic men expressed the opinion that, notwithstanding possible diversion of traffic to other transportation agencies, the addition of the surcharge to the intrastate rates would produce an increase in revenue." And as bearing upon the estimated revenue increase the Commission said: " There is nothing of record which warrants the conclusion that the situation as to fertilizer, cotton seed, cotton seed products, fresh vegetables, or sweet potatoes is different in Louisiana from what it is in other parts of the country, or in surrounding states where surcharges are now being assessed. Similar allegations with respect to the possible effect of truck competition and as to the ability of various commodities to stand any increase, were made in Ex parte 103 [The Fifteen Per Cent Case, 1931] and were considered in reaching our conclusions. Nor is there anything to show that the movement of sweet potatoes will be adversely affected by the application of a surcharge thereon without a similar charge on other potatoes."

Like findings were held sufficient to support similar orders, which had been entered in this same proceeding,

when attacked before district courts of three judges in Montana and Kentucky. *Montana* v. *United States*, 2 F.Supp. 448; *Kentucky* v. *United States*, 3 F.Supp. 778. Nor do they differ in any material way from those in *Wisconsin Passenger Fares*, 59 I. C. C. 391, 393, which were deemed adequately to support the finding of undue prejudice in *Wisconsin Railroad Comm'n* v. *C., B. & Q. R. Co., supra*, 580. See also *Georgia Commission* v. *United States, supra; Alabama* v. *United States*, 283 U.S. 776; *Louisiana Public Service Comm'n* v. *Texas & New Orleans R. Co.*, 284 U.S. 125.

3. The fact that the order of the Commission for the increase of interstate rates was permissive only does not affect the validity of its order prescribing minimum intrastate rates. The interstate rates after the addition of the authorized surcharges were lawful rates in interstate commerce, which was discriminated against by the failure to make corresponding increases in intrastate rates. This discrimination the Commission removed in the manner authorized by § 13 (4), by prescribing minimum intrastate rates at the same level as the interstate rates. The order precluded any unauthorized interference with state regulatory power by providing that it should be effective only so long as the surcharges upon interstate rates should be maintained by the carriers. *Reversed.*