**ARKANSAS PUBLIC SERVICE COMMISSION, and Reynolds Metals Company, Plaintiffs,**

v.

**UNITED STATES of America, and Interstate Commerce Commission, Defendants.**

No. 3256.

United States District Court
E. D. Arkansas, W. D.
Dec. 29, 1956.

John R. Thompson and Kay L. Matthews, Little Rock, Ark., for plaintiff, Arkansas Public Service Commission.

Wilbur A. LaRoe, Jr., Arthur L. Winn, Jr., Samuel H. Moerman, J. Stanley Payne, and Woodson P. Houghton, Washington, D. C., Gustav B. Margraf, Richmond, Va., and Leon B. Catlett, Little Rock, Ark., for plaintiff, Reynolds Metals Co.

Harry E. Meek, Little Rock, Ark., for intervening plaintiff, Aluminum Co. of America.

Victor R. Hansen, Asst. Atty. Gen., James E. Kilday and Maurice A. Fitzgerald, Attys., Dept. of Justice, Washington, D. C., and Osro Cobb, U. S. Dist. Atty., Little Rock, Ark., for defendant, United States.

Robert W. Giannane, General Counsel, and Samuel R. Howell, Asst. Gen. Counsel, Washington, D. C., for defendant, Interstate Commerce Commission.

R. H. Stahlheber, St. Louis, Mo., Clyde W. Fiddes, Tyler, Tex., Pat Mehaffy, and Toll R. Ware, St. Louis, Mo., for intervening defendant rail carriers.

Before WHITTAKER, Circuit Judge, LEMLEY, Chief Judge, and JOHN E. MILLER, District Judge.

WHITTAKER, Circuit Judge.

By this action plaintiffs, Arkansas Public Service Commission (hereafter called Arkansas Commission), and Reynolds Metals Company (hereafter called Reynolds), and intervening plaintiff, Aluminum Company of America (hereafter called Alcoa), ask this specially constituted three-judge Court to hold that the findings of Interstate Commerce Commission (hereafter called Interstate Commission), made on May 7, 1956, in its Docket No. 31660 (Arkansas Intrastate Freight Rates and Charges, 298 ICC 547), are not supported by substantial evidence, and are inadequate to support its order, entered on those findings on September 4, 1956, increasing Arkansas intrastate freight rates, on (so far as here concerned) sand and gravel, "crushed stone", asphalt rock and stone, coated, and related commodities, and cement, to the level of interstate rates on those commodities, and to enjoin enforcement of, and to set aside, that order.

While the Arkansas Commission attacks the whole order—contending that there is no substantial evidence to support the findings and that the findings, in turn, do not support the order—, Reynolds and Alcoa attack the order only insofar as it strikes down, or may be interpreted as striking down, an intrastate freight commodity description and rate, promulgated by the Arkansas Commission on May 3, 1956, applying only to "Limestone, run of crusher, to be used only for fluxing purposes, in the production of alumina, minimum weight 90 per cent of the marked capacity of the car used, from Limedale Spur and Myersville Spur, Arkansas, to Bauxite Junction, Arkansas, minimum weight 1,500 net tons to be shipped on one day from one consignor to one consignee" (hereafter called the Arkansas fluxing stone rate order of May 3, 1956), contending that the order, though indefinite, is subject to that interpretation, and, if so

construed—as the defendants, and the intervening rail carriers, do construe it—, is void, because that issue was not considered by the Interstate Commission, but was found by it to be "beyond the scope" of the case, and, hence, the order, so construed, is not supported either by any evidence or findings and is wholly arbitrary. This is the dominant issue in the case.

The defendants, the United States and Interstate Commission, and the intervening rail carriers doing business in Arkansas,[1] defend the order in all things —even the interpretation that it would strike down the Arkansas fluxing stone rate order of May 3, 1956, because, they argue, "fluxing stone" is but another "label" for, and is the same commodity as, "crushed stone", and, regardless of its use, it is subject to the published Arkansas intrastate rates, applicable generally to "crushed stone", which were increased by the challenged order of the Interstate Commission.

At the close of World War II the interstate, and the Arkansas intrastate, freight rates on the commodities involved were the same. To meet greatly increased needs of the nation's rail carriers for additional revenues after the close of that War, the Interstate Commission, upon petition of the carriers, held extensive hearings, participated in by representatives of the various state commissions, and, on December 5, 1946, in Ex Parte No. 162 (Increased Railway Rates, Fares and Charges, 1946, 266 ICC 537), it found that the needs of those carriers required a substantial increase in freight rates, applicable to both interstate and intrastate commerce, and it ordered a 20% increase in basic interstate rates in western territory, including Arkansas, in contemplation that the several states in that territory (including Arkansas) would make the same rates effective upon intrastate commerce. That increase is not here in-

---

1. Thirteen in all, but the dominant ones are Missouri Pacific Railroad Company, St. Louis-San Francisco Railway Company, St. Louis-Southwestern Railway Company and Chicago, Rock Island & Pacific Railroad Company.

volved, because the Arkansas Commission, upon petition of the rail carriers, made it effective on all commodities in that state. But, to meet the further needs of those carriers, the Interstate Commission, subsequently, and after similar extensive hearings, ordered horizontal increases in all basic interstate rates in western territory, including Arkansas, of 20% (in Ex Parte No. 166—Increased Freight Rates, 1947, 269 ICC 33, 270 ICC 81, 270 ICC 93, 270 ICC 403), and of 8%, except on cement (in Ex Parte No. 168—Increased Freight Rates, 1948, 272 ICC 695, 276 ICC 9), and of 12% again except on cement (in Ex Parte No. 175—Increased Freight Rates, 1951, 280 ICC 179, 281 ICC 557, 248 ICC 589, 289 ICC 395, 292 ICC 23, 297 ICC 17).

Though the rail carriers petitioned the Arkansas Commission to make the Ex Parte 166, 168 and 175 increases effective upon intrastate commerce in Arkansas (as the Interstate Commission contemplated would be done), it refused to grant any part of the X–166 and X–168 increases upon sand and gravel, "crushed stone" and related commodities, but it did grant one-half of the X–175 increase, or 6%, on those commodities, and, likewise, it granted only one-half of the X–166 increase, or 10%, on cement. The result was that the Arkansas intrastate rate was about 36% less than the interstate rate on sand and gravel, "crushed stone" and related commodities, and was 10% less than the interstate rate on cement.

On October 11, 1954, the Class I rail carriers operating in Arkansas filed a petition with the Interstate Commission, alleging that the refusal of the Arkansas Commission to authorize the full amounts of the X–166, X–168 and X–175 increases on the stated commodities had resulted (1) in preference and prejudice as between persons and localities in intrastate commerce in Arkansas, on the one hand, and persons and localities in interstate commerce, on the other hand, and (2) in discrimination against interstate commerce, as such, all in vio-

lation of Section 13(4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(4), and that, in consequence, they were being deprived of large amounts of revenue urgently needed to provide efficient transportation service as contemplated by Section 15a(2) of the Act. 49 U.S.C.A. § 15a(2). Pursuant to that petition (which ICC docketed as its No. 31660), and to Section 13(3) of the Act, 49 U. S.C.A. § 13(3), on November 16, 1954, the Interstate Commission issued an order directing an investigation into Arkansas intrastate freight rates and charges with respect to the commodities here involved. The Arkansas Commission, Reynolds, Alcoa, and other shipping interests, intervened in opposition to the petition.

Both Reynolds and Alcoa had, several years earlier, established large plants near Bauxite Junction, Arkansas (a point on the Missouri Pacific, about 25 miles south of Little Rock) for the manufacture of alumina, from which aluminum metal is made, and, in their manufacturing process, required huge amounts (in excess of 730,000 tons annually—or a 20-car trainload each day) of calcium for "fluxing" purposes. To supply that need they severally acquired large limestone deposits (of about 95% calcium carbonate and suitable to their needs), and established appropriate plants, at Myersville Spur and Limedale Spur (points about 2 miles apart in northwest Arkansas, also on the Missouri Pacific, and 153 and 136 miles, respectively, from Bauxite Junction).

No order of the Arkansas Commission required the rail carriers to publish, and the Missouri Pacific had not voluntarily published, any commodity description and rate in terms applying specifically to crushed stone for industrial or "fluxing" uses, and the Reynolds and Alcoa shipments of stone referred to moved under the Missouri Pacific's Arkansas intrastate rate applicable to "crushed stone" which was $1.37, per ton, from Myersville Spur and $1.28, per ton, from Limedale Spur to Bauxite Junction, which, if raised by 36% to the level of

the interstate rates, as sought by the rail carriers, would become $1.87, per ton, from Myersville Spur, and $1.77, per ton, from Limedale Spur to Bauxite Junction.

At intervals, over a long period of years, Reynolds had contended with Missouri Pacific that existing Arkansas intrastate rates on this commodity were abnormally high, in comparison with both interstate and intrastate rates voluntarily established in adjoining states by Missouri Pacific, and other railroads, covering crushed stone for industrial or "fluxing" uses, and it had implored Missouri Pacific to voluntarily publish in Arkansas a commodity description and rate, applicable specifically to crushed stone for industrial or "fluxing" uses. But, in the fall of 1954, Missouri Pacific finally declined, and, instead, instituted this proceeding to increase the Arkansas intrastate rates on "crushed stone" to the level of interstate rates or by 36%.

So, on March 2, 1955—and thus subsequent to the rail carriers' petition to the Interstate Commission of October 11, 1954, and to the latter's order of November 16, 1954 directing the 13th Section investigation referred to, but before it had been heard—, Reynolds instituted a complaint proceeding, before the Arkansas Commission, against Missouri Pacific, alleging that the rates and charges exacted and collected by it for the transportation of crushed limestone, to be used only for fluxing purposes in the production of alumina, from Myersville Spur and Limedale Spur, Arkansas to Bauxite Junction, Arkansas, are unduly discriminatory against Reynolds, and unduly favor shippers in Texas and other nearby states, and asking the Arkansas Commission to hear the issues and to establish a commodity description, and reasonable rate, applicable to the movement of crushed stone to be used only for "fluxing" purposes in the production of alumina, from Myersville and Limedale Spurs, Arkansas, to Bauxite Junction, Arkansas.

Thereafter, the Interstate Commission assigned the 13th Section investigation proceeding, pending before it, for formal hearing before a Commission Examiner, at Little Rock, and the matter was so heard at that place on March 21, 22, and 23, 1955. A large mass of evidence, oral and documentary, was introduced by the rail carriers, and some supporting intervenors (tending, generally, to show that the Arkansas intrastate rates, on the commodities here involved, as described in existing tariffs, were substantially lower than interstate rates—previously found reasonable, and established, by the Interstate Commission in X–166, X–168 and X–175—and failed to produce a fair share of the revenues required by the rail carriers to provide adequate service, and, thus, caused undue preference to intrastate shippers and undue prejudice against interstate shippers, and caused undue discrimination against interstate commerce, as such; that increasing those intrastate rates to the interstate level would not result in unreasonable rates, and would produce about $1,000,000 annually of additional revenue needed by the rail carriers to enable them to furnish adequate rail service), and by the Arkansas Commission and other shipping interests (tending, generally, to show the contrary, but particularly that the increase sought would place Arkansas intrastate rates above reasonable levels, and would also, as a consequence, divert a substantial amount of traffic to trucks, and, hence, the increases would fail to produce additional revenue to the rail carriers).

But, at that hearing, Reynolds and Alcoa offered evidence only in support of their contention that their "fluxing" stone (which, though of high calcium content, is of lower grade than, and has only half the value of, crushed stone, used as an aggregate in the making of concrete, and is shipped as it comes from the crusher, ranging from dust to 10-inch rocks) was a *sui generis* commodity and essentially different than "crushed stone" (which, as used in both the interstate and intrastate tariffs, was thought, generally, to mean stone that has been washed and screened to sizes of

from ½ inch to 2 inches, for use in the making of concrete), and they pointed to the regularity, capacity carloading and trainload quantities of their shipments, moving daily, over one line, from two neighboring origins to one destination, as transportation economies involved in their shipments that are not involved in the shipment of "crushed stone", generally, and they contended, on these bases that the existing "crushed stone" rates were unreasonably high, and that they were entitled to a separate commodity description and to a lower rate than the rate then applicable to "crushed stone" in Arkansas, as, they contended, Missouri Pacific had voluntarily made effective (intrastate) on industrial limestone or fluxing stone, in the neighboring state of Texas,[2] and (interstate—through Arkansas), on like commodities from Prairie du Rocher, Illinois, to Baton Rouge, Louisiana,[3] and they, specifically, called attention to the fact that a complaint proceeding, seeking a commodity description and lower rate for the shipment of their fluxing stone from Myersville and Limedale Spurs to Bauxite Junction, had been instituted, and was then pending awaiting trial, before the Arkansas Commission, and they orally prayed the Interstate Commission to stay this proceeding until the Arkansas Commission could resolve the issues in that complaint case, but, if such stay be refused, that the Interstate Commission find that the proposed increases are neither just nor reasonable, as applied to their fluxing stone shipments.

All this evidence was received subject to objections of counsel for the rail carriers, variously phrased, including (R. 174) "I am sure that an inquiry of that nature would be utterly foreign to the purpose of a 13th Section proceeding", and (R. 474) "I want it understood that our position is that the adjustment in the basic rate is not a proper function of a 13th Section proceeding", and, as stated by a principal witness for the rail carriers (R. 482), "Mr. Examiner, it is not my understanding that the basic rates on limestone are directly involved in this discrimination case, because prior to the Ex Parte 162 increases the state and interstate rates on this particular limestone traffic were the same, and I am presenting these rebuttal exhibits merely because the protestants have dealt with the level of these basic rates in their presentation."

At the conclusion of the hearing, the Examiner announced that a proposed report would be prepared and released in due season.

On September 7, 1955—and before the ICC's examiner's proposed report was prepared and filed (on October 18, 1955)—, the complaint proceeding instituted by Reynolds against Missouri Pacific came on for trial before, and was fully heard by, the Arkansas Commission, and was taken under submission for decision.

On October 18, 1955, the Interstate Commission's examiner filed his proposed report, generally supporting the position of the rail carriers and saying, among other things, with respect to the contentions of Reynolds and Alcoa, the following:

"The record shows that no separate classification exists in Arkansas intrastate tariffs for fluxing limestone. It carries the same rate as crushed stone. This is a proceeding under Section 13(4) of the Act and one of the issues concerns whether the Arkansas intrastate rate on crushed stone should be increased, as proposed, to correspond with the interstate rates. *Protestants' position amounts to a counter-proposal*

2. It appears that Missouri Pacific had established in Texas a commodity description and lower rate (than applicable to "crushed stone", generally) for industrial limestone or fluxing stone between the quarry points of Dittlinger, Mc-

Neil, New Braunfels and Ogden, Texas, to steel mills and similar industries at Houston, Lone Star, Corpus Christi, Waco and Evadale, Texas.

3. Limestone from Prairie du Rocher, Ill., to Baton Rouge, 276 ICC 381 (1949).

*which is not in issue in this proceeding."* (Emphasis supplied.)

And the examiner further stated:

"It is further contended that the reasonableness of Arkansas intrastate rates on fluxing stone is under consideration by the Arkansas Commission and any action under Section 13 of the Act should be deferred until the state Commission establishes reasonable and lawful rates."

Reynolds, Alcoa, the Arkansas Commission, and others timely filed exceptions to the examiner's proposed report.

On May 3, 1955, the Arkansas Commission filed its report and order in the complaint proceeding before it, in which, after making elaborate findings, it ordered:

"That the Missouri Pacific Railroad make effective for intrastate traffic in Arkansas a rate of $1.16 per ton of 2,000 pounds, including all Ex Parte increases authorized to the date of this order, to apply on 'Limestone, run of crusher, to be used only for fluxing purposes, in the production of alumina, minimum weight 90 percent of the marked capacity of the car used' from Limedale Spur and Myersville Spur, Arkansas to Bauxite Junction, Arkansas, minimum weight 1,500 net tons, to be shipped on one day from one consignor to one consignee."

Four days later, on May 7, 1956, ICC filed its report (298 ICC 547), overruling the exceptions mentioned, in which it elaborately discussed the issues and the evidence and made numerous subsidiary findings, including the following:

"The Aluminum Company of America and the Reynolds Metals Company use large volumes of crushed stone as a fluxing agent in refining crude ore in the production of aluminum at Bauxite Junction, Arkansas. Such stone is produced at Myersville Spur and Limedale Spur. Their position is that crushed stone, when moving for fluxing purposes, should have a lower base rate than crushed stone when moving for highway construction. They state that fluxing limestone is a physically different form of limestone than crushed stone used as a road aggregate, and that it is a lower grade, lower priced, heavier loading commodity, and moves in much larger and more regular volume than the road-aggregate stone. The Aluminum Company of America urges that a reasonable rate on fluxing stone from Myersville Spur to Bauxite Junction would be $1.3216 per ton, which is on the level of the Texas rates on fluxing and other industrial stone, and includes all authorized increases. That rate is compared with the present rate of $1.37 and the proposed rate of $1.87 on crushed stone.

"No separate classification for fluxing stone is provided in the respondents' Arkansas intrastate tariffs, nor in their interstate tariffs publishing rates to and from Arkansas. The same rates apply as on crushed stone. *Whether or not a separate classification should be provided on this commodity within Arkansas presents an issue which we understand is now pending in a complaint proceeding before the Arkansas Commission, and which is beyond the scope of this proceeding".* (Emphasis supplied.)

ICC then made its ultimate findings, finding, in essence, (1) that intrastate freight transportation conditions in Arkansas are not more favorable than those incident to interstate transportation between Arkansas and other states; (2) that the rate increases authorized in Ex Parte Nos. 166, 168 and 175, and here sought to be applied to Arkansas intrastate rates, are just and reasonable; (3) that the Arkansas intrastate rates on the commodities here concerned are lower than the interstate rates, and that traffic moving thereunder fails to produce its fair share of the revenues required to enable the rail carriers to provide adequate and efficient rail trans-

portation service, and unduly discriminate against interstate commerce; (4) that, with respect to sand and gravel, there is active competition between persons and localities, in interstate commerce, between points in Arkansas and points in other states, on the one hand, and persons and localities engaged in intrastate commerce in Arkansas, on the other, and that existing disparities between current intrastate and interstate rates on sand and gravel cause undue preference to intrastate shippers and localities, and undue prejudice to interstate shippers and localities; (5) that the undue preferences and prejudices respecting persons and localities, and the unjust discrimination against interstate commerce, should be removed by applying to the Arkansas intrastate rates, on the commodities here embraced, the same increases as were authorized in Ex Parte Nos. 166, 168 and 175; (6) that such increases will not result in unreasonable rates but will increase the rail carriers' revenues by approximately $1,000,000 annually, and (7) that such increased revenues are required from intrastate traffic in Arkansas to enable the rail carriers to furnish adequate and efficient railway transportation service, and the report concluded that, unless the Interstate Commission be notified by the Arkansas Commission, within 30 days, that it will permit these increases to be made effective, an order accordingly would be entered.

Thereafter, on June 18, 1956, the Missouri Pacific filed with the Interstate Commission a "Petition for Interpretation" of its report of May 7, 1956. It referred to the Arkansas Commission's order of May 3, 1956, and said that the Interstate Commission's report had left in doubt whether the increases it had found necessary on "crushed stone" were—in respect of the limestone shipments of Reynolds and Alcoa from Myersville and Limedale Spurs to Bauxite Junction for fluxing purposes—to be applied to the existing published rates on "crushed stone" of $1.37 from Myersville Spur, and $1.28 from Limedale Spur to Bauxite Junction, or to the new commodity description and $1.16 rate prescribed by the Arkansas Commission's order of May 3, 1956 applicable to limestone, run of crusher, moving between said points, to be used only for fluxing purposes, and it asked the Interstate Commission to issue a supplemental report or order leaving no doubt that the increases were to be added to "the rates existing at the time of the hearing" (March 21, 22 and 23, 1955) on "crushed stone" from Myersville Spur and Limedale Spur to Bauxite Junction.

On June 29, 1956 Reynolds filed a reply to Missouri Pacific's Petition for Interpretation, and a motion for reopening and reconsideration with respect to fluxing limestone moving from Myersville and Limedale Spurs to Bauxite Junction, in the light of the Arkansas Commission's order of May 3, 1956.

On July 2, 1956, Alcoa filed a reply to Missouri Pacific's Petition for Interpretation, contending that, by means of that petition, Missouri Pacific was proposing by "interpretation" to settle an issue which the Commission had not considered but had found to be "beyond the scope of this proceeding."

On July 11, 1956, the Arkansas Commission filed a petition for reopening and reconsideration.

On September 4, 1956, the Interstate Commission entered its order denying the motions of Reynolds and the Arkansas Commission for reopening and further consideration, but sustaining the petition of Missouri Pacific for interpretation of its report, and saying:

"Upon consideration of the record, the petition and the replies thereto, we find no distinction was made by the respondent railroads in their intrastate rates in Arkansas on crushed stone based on use for fluxing, or other purposes, *and the matter of establishing a separate classification for limestone for fluxing purposes was Not In Issue Under The Order Instituting This In-*

*vestigation, and that the evidence of record does not support a finding that such a distinction should be made Under The Issues Before This Commission In This Proceeding insofar as* the application of the authorized Ex Parte *general* freight rate increases referred to in the record are· concerned" (emphasis supplied),

and it thereupon ordered:

"That the respondent railroads, in complying with this order, shall add the said increases to *all existing* intrastate rates on crushed stone in Arkansas *regardless of use or special designation as to the use of that commodity.*"

and it further ordered that the rail carriers make the increases effective October 25, 1956.

On October 9, 1956, the Arkansas Commission and Reynolds brought this suit against the United States and the Interstate Commission to enjoin, and to set aside, said order, and, as stated, Alcoa has intervened as a plaintiff, and the rail carriers have intervened as defendants, and all parties were fully heard by us upon the record as made before the Commission, and upon briefs and in oral argument, at Little Rock, Arkansas, on November 26,· 1956.

The foregoing are, and we find them to be, the facts.

We now turn to the issues raised by the parties, under those facts, and to the law.

We deal first with the issues raised by the Arkansas Commission. Its first contention is that the Interstate Commission's finding, No. 4—that existing intrastate rates on sand and gravel cause undue preference to intrastate shippers and localities, and undue prejudice to interstate ones—is neither· supported by substantial evidence nor adequate to justify the Commission's state-wide order increasing local rates to the level of the interstate ones on those commodities.

In view of the fact that the object of this action was to increase Arkansas rates, not in certain localities but *state-wide,* to the level found reasonable, and necessary to the revenue needs of the rail carriers, by the Interstate Commission in Ex Parte Nos. 166, 168 and 175— necessarily upon the ground that then existing Arkansas rates unduly discriminate against interstate commerce, as such—we think that this point is really immaterial tó the case, but it is·presented and we deal with it briefly.

 The record shows that interstate shippers of sand and gravel located at Doniphan and Iron Mountain, Missouri, and at Fort Gibson, Oklahoma, all near the north and northwest Arkansas borders, compete with Arkansas shippers of those commodities in local areas in the northeast, north central and northwest parts of Arkansas, and that those interstate shippers are prejudiced to the preference of the intrastate ones on sand and gravel in those local areas in Arkansas, to the extent of the difference in the interstate rate over the intrastate one. But there is no evidence that such competition exists beyond those local areas in Arkansas or that it is state-wide, nor does the Interstate Commission otherwise find, yet its order, to the extent based on this finding, extends throughout the state of Arkansas.

The Supreme Court has held, in State of North Carolina v. United States, 325 U.S. 507, 512–514, 65 S.Ct. 1260, 1264, 89 L.Ed. 1760, that such a finding "is an inadequate support for nullifying state rates on the ground that they constitute unjust discrimination against interstate" traffic. The Supreme Court has likewise so held in Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 579, 580, 42 S.Ct. 232, 66 L.Ed. 371, and in State of Florida v. United States, 282 U.S. 194, 208, 51 S.Ct. 119, 75 L.Ed. 291. We, therefore, must and do hold that this finding does not constitute an adequate basis to support a statewide "general sweeping order against all intra-state * * * rates", North Carolina case, 325 U.S. at page 513, 65 S.Ct. at page 1264, on sand and gravel in Arkansas.

The next contention of the Arkansas Commission is that the Commission's other findings (that the increases authorized, on the commodities involved, are just and reasonable, and that the Arkansas intrastate rates fail to produce a fair share of the revenues required to enable the rail carriers to provide adequate service, and cause an undue discrimination against interstate commerce which should be eliminated by increasing the Arkansas intrastate rates to the level of the interstate ones, and that such increases will not result in unreasonable rates and will produce additional revenues of about $1,000,000 annually, which is required to enable the rail carriers to furnish adequate service) are not supported by substantial evidence and are themselves inadequate to support the Commission's order.

We have carefully read and considered the three-volume transcript of the evidence and the 91 lengthy exhibits, adduced before the Commission. It may be admitted that this evidence, on the issue of reasonableness of the existing intrastate rates and upon the issue of the rail carriers' needs for the additional revenue to be produced by the increases though rather extensive, would perhaps not be sufficient to support a like order in a fully developed rate case. But, as stated, the purpose of this case is to eliminate a discrimination against interstate commerce by increasing the intrastate rates to the level of the interstate ones (found by the Interstate Commission to be reasonable, and needed by the rail carriers, in Ex Parte Nos. 162, 166, 168 and 175), to the end that the interstate rates will bear their fair share of the cost of adequate rail service. This, therefore, is a revenue case, and, as said by the Supreme Court in King v. United States, 344 U.S. 254, 275, 73 S.Ct. 259, 270, 97 L.Ed. 301:

"It is not necessary, for general revenue purposes, to establish for each item in each freight rate a fully developed rate case.

" '(T)he administrative arm of the Commission (would be) para-lyzed, if instead of adjudicating upon the rates in a large territory on evidence deemed typical of the whole rate structure, it were obliged to consider the reasonableness of each individual rate before carrying into effect the necessary increased schedule.' United States v. [State of] Louisiana, 290 U.S. 70, 75–76, and see 78–79, 54 S.Ct. 28, 31, and see pages 32–33, 78 L.Ed. 181."

Here the Commission has applied to the Arkansas intrastate rates the same conclusions it reached, in Ex Parte Nos. 166, 168 and 175, as to the need of the rail carriers for increased revenue on a national basis and has distributed the burden within Arkansas on the same lines it followed when estimating the revenues available in the southwestern territory from intrastate as well as interstate operations, as was done in Florida and approved by the Supreme Court in the King case, 344 U.S. at page 272, 73 S.Ct. at page 269, and here, as in that case, "The evidence which forms the basis of the Commission's nation-wide order becomes the natural basis for its [Arkansas] order". King case, 344 U.S. at page 272, 73 S.Ct. at page 269.

As was said, under like circumstances, in Illinois Commerce Commission v. United States, 292 U.S. 474, 483–484, 54 S.Ct. 783, 787, 78 L.Ed. 1371:

"The decision in the first proceeding, that the increase in the interstate rate was reasonable, was made in the hope that the state commissions would bring intrastate rates into harmony. When they failed to do so, the Commission reaffirmed its finding that the new interstate rates were reasonable and found that the intrastate rates must be raised in order that the intrastate traffic may bear its fair share of the revenue burden. It is plain from the nature of the inquiry that the rate level, to which both classes of traffic were raised, was found reasonable on the basis of the traffic as a

whole. Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the interstate rates more specifically, or to separate intrastate and interstate costs and revenues. Compare American Express Co. v. [State of] South Dakota ex rel. Caldwell, 244 U.S. 617, 37 S.Ct. 656, 61 L.Ed. 1352; United States v. [State of] Louisiana, supra [290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 81]; State of Florida v. United States, supra [292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. 1077]".

In the light of these decisions, we are fully convinced that the evidence adequately supports the Commission's findings as to the need for, and the reasonableness of, the ordered increases in Arkansas intrastate rates as they existed at the time of the hearing before the Commission in March, 1955.

■ The Arkansas Commission also contends that the increases will cause a large amount of present rail traffic to be diverted to trucks and that, as a result, the increases will not produce additional revenue to the rail carriers, and that the Interstate Commission's finding to the contrary is not supported by substantial evidence. There was much—we think quite substantial—evidence, both ways, on this issue, and it was, thus, one of fact, for resolution by the Interstate Commission, and its finding thereon must be held to be supported by substantial evidence.

■ As to the contention of the Arkansas Commission that the Interstate Commission's findings do not adequately support its order of September 4, 1956, we have compared those findings with the ones found adequate, in a like situation, by the Supreme Court in the King case, and, on the strength of that case, we must and do hold that the Interstate Commission's findings here adequately support its order, as respects Arkansas intrastate rates on the commodities here involved as those commodities and rates were described and set forth in the published tariffs effective at the time of the hearing before the Interstate Commission in March, 1955 (so stated to make certain that we do not here mean, inferentially, to approve so much of the Interstate Commission's order as would, or as might, strike down the Arkansas Commission's fluxing stone rate order of May 3, 1956).

This brings us to the issue presented by Reynolds and Alcoa, which is the principal and most troublesome question in the case. They contend that, though the rail carriers took the position at the hearing before the Interstate Commission that the matter of a new Arkansas commodity description or classification and a lower rate for their fluxing stone was "utterly foreign to", and "not a proper function of" a 13th Section proceeding, and though the Interstate Commission's examiner did not consider their contentions but said that their "position amounts to a counter-proposal which is not in issue in this proceeding", and though the Interstate Commission itself did not consider their contention, but said in its report "Whether or not a separate classification should be provided on this commodity within Arkansas presents an issue which we understand is now pending in a complaint proceeding before the Arkansas Commission, and which is beyond the scope of this proceeding", yet the Interstate Commission's order of September 4, 1956, here attacked, though itself saying that "The matter of establishing a separate classification for limestone for fluxing purposes was not in issue under the order instituting this investigation", nevertheless strikes down the Arkansas Commission's fluxing stone rate order of May 3, 1956, by ordering the rail carriers to add the increases "to all *existing* intrastate rates" (which would include the Arkansas fluxing stone rate order *of May 3, 1956)* "on crushed stone in Arkansas

*regardless of use or special designation as to the use of that commodity"* (emphasis supplied), all without process, consideration, evidence or findings, and that, therefore, the Commission's order, insofar as it affects, or may affect, the Arkansas fluxing stone rate of May 3, 1956, is wholly void and should be enjoined and set aside.

The defendants, including the Interstate Commission itself, seek to defend the Interstate Commission's order—even that construction of it which would strike down the Arkansas Commission's fluxing stone rate order of May 3, 1956—upon the ground that crushed limestone, though to be used only for industrial or fluxing purposes, is just "crushed stone", and is subject to the increased rates applying to crushed stone; and that it was not "proper" for the Arkansas Commission to entertain a proceeding to establish, or to order established, a new commodity description and rate for "limestone, run of crusher, to be used for fluxing purposes in the production of alumina", while a 13th Section proceeding, involving intrastate rates on "crushed stone", was pending.

It cannot be doubted that original and primary jurisdiction and power to fix intrastate rates in Arkansas is vested in the Arkansas Commission, State of North Carolina v. United States, 325 U.S. 507, 510–511, 65 S.Ct. 1260, 89 L.Ed. 1760; Illinois Commerce Commission v. Thomson, 318 U.S. 675, 684–685, 63 S.Ct. 834, 87 L.Ed. 1075; State of Florida v. United States, 282 U.S. 194, 211–212, 51 S.Ct. 119, 75 L.Ed. 291; Arkansas Railroad Commission v. Chicago, R. I. & P. R. Co., 274 U.S. 597, 603, 47 S.Ct. 724, 71 L.Ed. 1224; Illinois Central R. Co. v. Public Utilities Commission, 245 U.S. 493, 510, 38 S.Ct. 170, 62 L.Ed. 425; American Express Co. v. State of South Dakota, 244 U.S. 617, 625, 37 S.Ct. 656, 61 L.Ed. 1352, and that no such jurisdiction or power is granted to, or vested in, the national government or its Interstate Commerce Commission, ibid.

As said by Justice Black in the North Carolina case, 325 U.S. at page 511, 65 S.Ct. at page 1263, "Neither § 13(4) [of the Interstate Commerce Act], nor any other Congressional legislation, indicates a purpose to attempt wholly to deprive the states of their primary authority to regulate intra-state rates. Since the enactment of § 13(4), as before its enactment, a state's power over intra-state rates is exclusive up to the point where its action would bring about the prejudice or discrimination prohibited by that section. When this point—not always easy to mark—is reached, and not until then, can the Interstate Commerce Commission nullify a state-prescribed rate", and even then, as Justice Black further said in that case, 325 U.S. at page 511, 65 S.Ct. at page 1263, " * * * The Interstate Commerce Commission is without authority to supplant a state-prescribed intra-state rate unless there are clear findings, supported by evidence, of each element essential to the exercise of that power by the Commission", and it has been often and clearly held that Interstate Commerce Commission justification for the "exercise of the federal power must clearly appear", State of Florida v. United States, supra [282 U.S. 194, 51 S.Ct. 124], and an intention of that Commission to interfere with the state's rate-making function is not to be presumed, Arkansas Railroad Commission v. Chicago, R. I. & P. R. Co., supra, and may not be left in serious doubt, Illinois Commerce Commission v. Thomson, supra, but must meet "a high standard of certainty", Illinois Central R. Co. v. Public Utilities Commission, supra [245 U.S. 493, 38 S.Ct. 176].

Was the Arkansas Commission acting within its exclusive original and primary jurisdiction and power to prescribe intrastate rates in Arkansas when it promulgated the Arkansas fluxing stone order of May 3, 1956?

There can be no doubt—and, in fact, it is conceded—that if the Arkansas Commission had promulgated that commodity description and rate before the institution of this 13th Section investigation, its fluxing stone rate order of May 3,

1956 could not be stricken down by the Interstate Commission except by a frontal attack, in a proceeding brought for the purpose, or properly expanded to embrace it, and upon clear findings supported by substantial evidence.

Hence, the determinative question is: Did the earlier institution of this 13th Section investigation proceeding deprive the Arkansas Commission of jurisdiction and power to prescribe its fluxing stone rate order of May 3, 1956? If it did not, then that order was not *void* and cannot be stricken down by the Interstate Commission without consideration and indirectly, by inference or ambiguous language, but only in a frontal attack, in a 13th Section proceeding brought for the purpose, or properly expanded to embrace it, and under procedural due process, and upon clear findings, supported by substantial evidence, and by an order, meeting a high degree of certainty and leaving no serious doubt of its meaning.

Defendants attack the jurisdiction of the Arkansas Commission to make, in these circumstances, its fluxing stone rate order of May 3, 1956, but admit that there is no decision holding that the prior institution of a 13th Section investigation proceeding deprives a state commission of its original and primary jurisdiction to prescribe an interstate commodity description and rate, though they argue that such ought to be the law, in the circumstances here, and that we should so declare.

We have carefully considered the point, but, in view of the numerous clear and specific holdings by the Supreme Court, above cited, that exclusive original and primary jurisdiction to prescribe intrastate rates is vested in the respective state commissions, and not in the Interstate Commerce Commission, and in view of the fact that no act of Congress or decision of the Supreme Court has stated or indicated—if, indeed, either might validly do so—any limitation upon that exclusive, original and primary jurisdiction, or any condition under which the states may be deprived of it, we must hold that the earlier institution of this 13th Section proceeding to increase then existing intrastate rates in Arkansas—and in which proceeding the Interstate Commission found the matter of a new Arkansas commodity description and rate for fluxing stone, and also the Arkansas Commission's order thereon of May 3, 1956, to be "beyond the scope" of its investigation—did not deprive the Arkansas Commission of its exclusive, original and primary jurisdiction to prescribe its Arkansas fluxing stone rate order of May 3, 1956, in the first instance.

Defendants argue that it is not "proper" for the Arkansas Commission to so act in such circumstances, and that to permit it to do so will substantially impair administration by the Interstate Commission of the 13th Section of the Interstate Commerce Act. We believe that this is not so—for, as indicated, it is always open to the Interstate Commission, under the 13th Section of the Interstate Commerce Act, to remove an undue discrimination against interstate commerce in a proper proceeding—but whether so or not, it is not our function to say what is "proper" conduct of the Arkansas Commission in the circumstances, but, rather, our concern is whether, in the promulgation of its fluxing stone rate order of May 3, 1956, it acted within its exclusive original and primary jurisdiction and power to prescribe an intrastate classification or commodity description and rate order, as we think it did.

We bear in mind that here there was no attempt covertly to circumvent or evade 13th Section jurisdiction and power of the Interstate Commission over intrastate rates, discriminatory against interstate commerce. Both the Interstate Commission's examiner and the Commission itself were formally advised of the complaint proceeding then pending before the Arkansas Commission (seeking a new commodity description and lower rate in Arkansas for fluxing stone as a *sui generis* commodity), and both were asked by Reynolds to stay the interstate

proceeding until the Arkansas Commission could act. Both refused the stay and said that matter was "beyond the scope of this proceeding". Even after the Arkansas Commission had acted, Reynolds and the Arkansas Commission petitioned the Interstate Commission to reopen its proceeding to consider the new Arkansas fluxing stone rate order of May 3, 1956 (thus offering to expand the Interstate Commission's proceeding to include that order), but it denied that petition and again said, in its order of September 4, 1956, that that matter "was not in issue under the order instituting this investigation", yet, in that very order, it uses language that would strike down the Arkansas Commission's fluxing stone rate order of May 3, 1956, and, in this Court, where its order is under attack for that reason, it stands its ground and prays that its determination be confirmed. This shocks the conscience.

Here, admittedly, the Interstate Commission did not consider the Arkansas Commission's fluxing stone rate order of May 3, 1956, and admittedly there was no finding by it to support that interpretation and effect of its order of September 4, 1956 which would nullify the Arkansas Commission's fluxing stone rate order of May 3, 1956, and it is obvious that the Interstate Commission's order of September 4, 1956, though subject to that interpretation, does not, in this respect, meet the high standard of clarity and certainty which the law requires.

The Missouri Pacific is presently moving Reynolds' and Alcoa's fluxing stone from Myersville and Limedale Spurs to Bauxite Junction under the Arkansas Commission's fluxing stone rate order of May 3, 1956, but avowedly it will—under its interpretation, and the interpretation of the Interstate Commission, of the Interstate Commission's order of September 4, 1956—unless enjoined by us in this proceeding, entirely ignore, and thus completely nullify the effect of, the Arkansas Commission's fluxing stone rate order of May 3, 1956, all without consideration, evidence or findings.

Our conclusion is, and we hereby hold, that the order of the Interstate Commission of September 4, 1956, here under attack, is valid and enforceable, except to the extent that it does, or may, affect the Arkansas Commission's fluxing stone rate order of May 3, 1956, and in that respect and to that extent it is invalid and should be enjoined, and, accordingly, we enter the following decree.

### Decree

This specially constituted statutory three-judge Court having heard the evidence, and having heard the arguments and considered the briefs of counsel, and being fully advised in the premises, finds the facts to be, and concludes the law to be, as set forth (above) in its opinion herein of this date, and, based thereon, it is Ordered, Adjudged and Decreed by the Court that the order of the Interstate Commerce Commission of September 4, 1956, in its Docket No. 31660, entitled "In the Matter of Increased Freight Rates and Charges in the State of Arkansas", is valid and may be enforced, except to the extent that it does, or may, in any way, affect the Arkansas intrastate rate order made by the Arkansas Public Service Commission on May 3, 1956 in its Docket No. R–976 entitled "Reynolds Metals Company v. Bauxite & Northern Railway Co. and Missouri Pacific Railroad Co.", but in that respect and to that extent said order of the Interstate Commerce Commission of September 4, 1956 is invalid and its enforcement should be, and is hereby, permanently enjoined.