ARCTIC SLOPE REGIONAL CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, and United States of America, Respondents,

State of Alaska, Amerada Hess Pipeline Corp., ARCO Pipe Line Company, Exxon Pipeline Co., Sohio Alaska Pipeline Co., Union Alaska Pipeline Co., BP Pipelines Inc., Mobil Alaska Pipeline Co., Phillips Alaska Pipeline Corp., Intervenors.

ARCTIC SLOPE REGIONAL CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, and United States of America, Respondents,

Amerada Hess Pipeline Corp., Exxon Pipeline Co., ARCO Pipe Line Company, BP Pipelines Inc., Mobil Alaska Pipeline Co., Unocal Pipeline Co., Phillips Alaska Pipeline Corp., State of Alaska, Sohio Alaska Pipeline Co., Intervenors.

Nos. 86–1115, 86–1427.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1987.

Decided Oct. 27, 1987.

John J. Powers, III, Robert J. Wiggers and Donald A. Kaplan, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent, U.S.

Richard J. Flynn, with whom Eugene R. Elrod, Kevin Hawley, Washington, D.C., for Exxon Pipeline Co.

Albert S. Tabor, Jr., John E. Kennedy, Houston, Tex., and David T. Andril, Washington, D.C., for Amerada Hess Pipeline Corp.

Robert E. Jordan, III, Steven H. Brose, Timothy M. Walsh and Steven Reed, Washington, D.C., for ARCO Pipe Line Co.

Eugene E. Threadgill, Washington, D.C., for BP Pipelines, Inc.

John P. Dean, Washington, D.C., for Mobil Alaska Pipeline Co.

Raymond N. Shibley, Brian D. O'Neill and Glenn E. Davis, Washington, D.C., for Phillips Alaska Pipeline Corp.

Robert A. Johnson, Frederick G. Wohlschlaeger, Philip R. Ehrenkranz, Keith R. McCrea, Paul F. Forshay, Washington, D.C., for Sohio Alaska Pipeline Co.

Patrick M. Raher and David J. Hayes, Washington, D.C., for Union Alaska Pipeline Co., were on the joint brief for intervenors, Exxon Pipeline Co., et al. Kenneth P. Fountain, Houston, Tex., also entered an appearance for Exxon Pipeline Co.

Gerald A. Costello also entered an appearance for ARCO Pipe Line Co.

R. Brian Corcoran, Washington, D.C., also entered an appearance for BP Pipelines, Inc.

O. Yale Lewis, Jr., Seattle, Wash., with whom Richard A. Curtin, John W. Phillips, Columbus, Ohio, and William W. Becker, Washington, D.C., were on the brief, for petitioner.

Hanford O'Hara, Atty., F.E.R.C., with whom Catherine C. Cook, General Counsel and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent, F.E.R.C. Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., also entered an appearance for respondent, F.E.R.C.

Andrew J. Kilcarr, Washington, D.C., also entered an appearance for Mobil Alaska Pipeline Co.

John Lansdale, James L. Trump and William K. Black, Washington, D.C., also entered appearances for Sohio Alaska Pipeline Co.

Steven S. Rosenthal and Robert H. Loeffler, Washington, D.C., entered appearances for intervenor, State of Alaska.

Before RUTH BADER GINSBURG, STARR and NIES *, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

These consolidated cases present a challenge to orders by the Federal Energy Regulatory Commission approving a multi-party settlement of extended administrative litigation attacking rates filed by the owners of the Trans Alaska Pipeline System (TAPS). After reviewing the various contentions pressed by the sole remaining party which contested the settlement, we conclude that the Commission's action is within lawful bounds and accordingly deny the petitions for review.

## I

The story of the Trans Alaska Pipeline System has been oft repeated and scarcely requires recounting yet again. Suffice it to say that, after the discovery of vast oil reserves on the North Slope of Alaska in 1969, various oil companies constructed an 800–mile pipeline from the Prudhoe Bay field south to the warm water port of Valdez. From rather modest estimates at the outset, TAPS was ultimately completed at a cost of over $9 billion. Oil started to flow through TAPS in the summer of 1977 and has continued since. TAPS' owners,[1] common carriers under the Interstate Commerce Act, 49 U.S.C. §§ 1 *et seq.* (ICA or Act), duly filed their tariff rates with the Interstate Commerce Commission in 1977, as required by law, *see* 49 U.S.C. § 1(1)(b). The rates as filed in 1977 ranged from $6.04 to $6.44 per barrel. Promptly thereafter, in June 1977, several parties filed protests and petitions seeking to invoke the Commission's investigatory powers pursuant to sections 15(1) and 15(7) of the Act and challenging the rates as unjust and unreasonable. The parties included the Department of Justice, the State of Alaska, the ICC Bureau of Investigations and Enforcement, and the Arctic Slope Regional Corporation (Arctic), the petitioner in these two cases.

Arctic is a private corporation. It represents the interests of Alaskan natives whose aboriginal claims were extinguished by an act of Congress granting them title to 4.5 million acres of land on the North Slope.[2] Arctic thus enjoys ownership interests in substantial possible and proven oil reserves, the only possible method of transport for which is TAPS. However, Arctic's interest in TAPS tariffs stems from its ongoing negotiation of exploration leases and the level of bonus and royalty payments it may achieve, sources of compensation that are potentially affected by transportation costs in bringing oil via TAPS to market. Arctic has never shipped any oil through the pipeline; indeed, all agree that Arctic has no realistic possibility of doing so until sometime in the 1990's.

Following the filing of initial rates and the ensuing protests, protracted administrative litigation unfolded before FERC, which on October 1, 1977 stepped into the shoes of the ICC as regulator of oil pipeline rates.[3] The rate challenges fell into two categories. First, the challengers objected to the rate setting methodology and proposed rate of return established in the initial filing. Second, the objectors claimed that imprudent costs had been incurred

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

1. The eight owners of TAPS are: Arco Pipe Line Company (ARCO), BP Pipelines Inc. (BP), Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Corporation, Union Alaska Pipeline Company, Sohio Alaska Pipe Line Company (Sohio), and Amerada Hess Pipeline Corporation (Amerada Hess). The owners will be referred to at times as the "Carriers" or "Intervenors."

2. Alaska Native Claims Settlement Act of 1971, *codified at* 43 U.S.C. §§ 1601–1628 (1982 & Supp. III 1985).

3. In October 1978, the Interstate Commerce Act was recodified at 49 U.S.C. §§ 10101–11916. However, oil pipelines continue to be regulated under the original Act, and statutory references

during construction of the pipeline.[4] Accordingly, the Administrative Law Judge assigned to the case divided the litigation into so-called Phase I and Phase II proceedings to coincide with these two distinct areas of challenge. *See* Brief for Petitioner at 10. The complexity of the issues and the magnitude of the proceedings which followed are dramatically evidenced by the expenditure of hundreds of days of hearings before several ALJs, with over 15,000 exhibits and upwards of 65,000 pages of transcript. *See* Brief for Intervenors at 7.

With the agency proceeding grinding on at a glacial pace, Alaska and two of the TAPS owners, ARCO and BP, entered into settlement negotiations in 1984. From this beginning, Alaska and six of the eight owners managed to reach settlement by July 1985. *See* Settlement Agreement (June 28, 1985), Joint Appendix (J.A.) at 502. (Phillips Alaska, not an original party to the settlement, agreed to join on July 3, 1985, *see* Stipulation Adopting Offer of Settlement (July 3, 1985) (J.A. at 681).) Among other things, the settlement established a complex and comprehensive rate-setting methodology (the TAPS Settlement Methodology or TSM) until the year 2011, the estimated remaining useful life of the pipeline. The settlement further established rate ceilings for the life of the pipeline and provided for a substantial refund to the State of Alaska for tariff costs previously incurred. Under the TSM, which is the centerpiece of the settlement agreement, rates are set on an annual basis, and are regarded under the regulatory scheme as any other rate filings by a common carrier. Thus, any such rates are subject to challenge by non-settling parties, such as Arctic, as well as any other non-signatory. Over the long haul, the financial impact of the settlement is two-fold: (1) to "front-end load" the tariffs charged by the owners in the early, pre-settlement years of the pipeline and (2) to provide for diminishing rates beginning with the initial rates filed under the settlement in December 1985.[5]

Blessed with Justice Department approval, this Six–Carrier Settlement Agreement was presented to the various ALJs responsible for the multi-faceted litigation and subsequently was certified by them to the Commission. However, the proposed arrangement was attacked by several parties,

---

in this opinion will be to the prior version of Title 49 of the United States Code.

**4.** There were various other issues in both the proceedings, but the primary focus of the litigation was as indicated in text.

**5.** The settlement also contains a provision which allows the carriers under some circumstances to reallocate certain costs and revenues among themselves. This provision, Section II–2(f) of the Settlement Agreement, seeks to correct certain inequities that result from the methods of cost recovery under the TSM versus the previous system for allocating costs among the owners. Under this provision, Carriers whose pipeline ownership percentage exceed their terminal ownership percentage are required to make per barrel payments to Carriers whose terminal percentage ownership exceed their pipeline ownership. The need for these payments arises because the recovery of costs under TSM is keyed to barrel-mile share, which does not fully account for those Carriers' costs who own a disproportionately large share of terminal tankage. Another aspect of the reallocation provision corrects potential inequities that may arise if the volume of TAPS throughout falls below capacity. Because costs are charged to Carriers based on percentage of pipe-line ownership, but recovered based on barrel miles, if throughput falls below capacity, those owners with disproportionately large percentage ownership would not recover their fair share of the costs. Section II–2(f) seeks to mitigate this potential inequity.

Because this reallocation provision constitutes a pooling arrangement within the meaning of § 5(1) of the ICA, 49 U.S.C. § 5(1), the Carriers applied for specific approval of the arrangement apart from the general settlement. *See* Application for Approval under 49 U.S.C. § 5(1) of an Agreement for the Reallocation of Certain Costs and Revenues (September 3, 1985) (J.A. at 996). The pooling agreement is explained in detail in the September 3, 1985 application. The Commission, pursuant to its statutory responsibilities, approved the arrangement in its October 23, 1985 approval of the settlement. *See* Order Approving Settlement as to Settling Parties, Granting Application, and Remanding Proceedings as to Nonsettling Parties (October 23, 1985), 33 F.E.R.C. (CCH) ¶ 61,064 (Supplemental Appendix (S.A.) at 220) (hereinafter referred to as the October 23 Order).

In view of our resolution that Arctic may properly be prevented from challenging the settlement as a whole, we have no occasion in this case to pass on the propriety of the Commission's treatment of the pooling agreement.

namely Arctic, the Alaska Public Interest Research Group (AkPIRG),[6] and the two remaining non-settling owners, SOHIO and Amerada Hess. The bases for these attacks included assertions that numerous genuine material issues of fact remained and that the settlement established unjust and unreasonable, non-cost based tariffs.

The Commission severed the contesting parties and approved the Six-Carrier Settlement as uncontested on October 23, 1985. *See* October 23 Order, 33 F.E.R.C. (CCH) ¶ 61,064 (S.A. at 220). Buoyed by the Justice Department's support and that of its own staff, the Commission concluded that the settlement was fair and reasonable and in the public interest, as required by its rules. *See* 18 C.F.R. § 385.602(g) (1987). To accommodate the interests of the non-settling parties, the Commission remanded the case to the ALJs to consider the non-settling parties' objections and to determine whether the settlement should be imposed upon them. On December 19, 1985, the Commission denied Arctic's motion for rehearing of the October 23 Order. *See* Order Denying Rehearing, 33 F.E.R.C. (CCH) ¶ 61,392 (December 19, 1985) (S.A. at 226) (the "December 19 Order").

Arctic then petitioned this court for review of the December 19 Order. That petition comprises No. 86–1115. The TAPS owners, as intervenors, moved to dismiss the petition on the grounds that Arctic was not aggrieved by the settlement, and that Arctic therefore lacked standing under the Hobbs Act, 28 U.S.C. § 2344 (1982), to seek review of the Commission's action. Concluding that Arctic's "contentions present the requisite injury to make petitioner an aggrieved party," a motions panel of this court denied intervenors' motion to dismiss, *see* Order Denying Motion to Dismiss in

No. 86–1115 (D.C.Cir. July 14, 1986) (Edwards and Bork, JJ.).

Meanwhile, as the settlement proceedings were pending on remand to the ALJs, the two remaining owners agreed to join in the settlement agreement. Accordingly, the State of Alaska and the Department of Justice proposed that the two owners be formally added to the Six–Carrier Agreement. Arctic strenuously objected to the amended settlement. However, inasmuch as the ALJs viewed the agreement as identical in all material respects to the Six–Carrier Settlement, they promptly certified the amended settlement agreement to the Commission. *See* Presiding Judges' Certification of Settlement Proposal to the Commission, 35 F.E.R.C. (CCH) ¶ 63,018 (April 15, 1986) (S.A. at 232).

Pursuant to its settlement rules, the Commission in June 1986 severed Arctic (which by that time was the sole non-consenting party) from the proceeding and approved the proposed settlement as uncontested under FERC Rule 602(g).[7] *See* Order Approving Settlement, Granting Application, Affirming Initial Decision, and Terminating Dockets, 35 F.E.R.C. (CCH) ¶ 61,425 (June 27, 1986) (S.A. at 239) (hereinafter the June 27 Order).[8] This action was taken in reliance on this court's decision in *United Municipal Distributors Group v. FERC*, 732 F.2d 202 (D.C.Cir.1984), a case that looms large in both sides' arguments before us. There, briefly stated, the court approved FERC's severance of a protestant-ratepayer from a proposed settlement where the ratepayer was afforded a further procedural remedy (consistent with the statute and the Commission's rules) to challenge the rates it was being charged. Relying upon that decision, FERC dis-

---

**6.** AkPIRG dropped out of the litigation, apparently before the Commission's final order terminating the TAPS proceeding, *see* Order Approving Settlement, Granting Application, Affirming Initial Decision, and Terminating Dockets, 35 F.E.R.C. (CCH) ¶ 61,425, at 61,982 n. 52 (June 27, 1986) (S.A. at 239, 245), and is not a party in this court.

**7.** Rule 602(g) provides in pertinent part:
　(3) An uncontested offer of settlement may be approved by the Commission upon a find-

ing that the settlement appears to be fair and reasonable and in the public interest.
18 C.F.R. § 385.602(g)(3).

**8.** In its June 27 Order, the Commission also approved the application of Sohio and Amerada Hess to be added to the pooling arrangement. *See* Motion of Amerada Hess Pipeline Corporation and Sohio Pipe Line Company (March 12, 1986) (J.A. at 1103).

cerned no present aggrievement[9] on Arctic's part by virtue of the settlement.

Finally, the Commission terminated all dockets in the TAPS proceeding. But in so doing, FERC made several things abundantly clear: that the settlement was not being imposed on Arctic and that Arctic therefore retained the right to challenge any future rates; that FERC's approval of the settlement did not in any manner determine that the rates established under it are (or will be) just and reasonable; that the settlement would be of no precedential value in future rate challenges; and that whatever material in the record may be relevant would be fully available to Arctic in any future proceedings.

Following the Commission's June 27 order, Arctic timely petitioned this court for review, and that case, No. 86–1427, consolidated with No. 86–1115, present the issues now before us.

## II

The thrust of Arctic's challenge is that the Commission acted improperly in approving the proposed settlement in the face of its, Arctic's, vigorous opposition. In Arctic's view, the Commission was duty bound under the Interstate Commerce Act to see the 1977 rate proceeding to the terminus of determining whether the challenged rates were "just and reasonable." Arctic maintains that all parties to the proceeding, not to mention the Supreme Court, *see Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), contemplated that the mammoth administrative litigation would culminate in the establishment of just and reasonable rates. Discounting the role of settlements in the administrative process, Arctic emphasizes instead the agency's duty to as-

sure lawful rates. Petitioner discerns this overriding obligation in the ICC's (now FERC's) general statutory mandate to assure that rates charged are just and reasonable, and in case law suggesting that once the agency has substantially completed an investigation, it is obliged to see the matter through to completion. *See Minneapolis Gas Co. v. FPC*, 294 F.2d 212 (D.C. Cir.1961) (a rate case under the Natural Gas Act); *see also City of Chicago v. United States*, 396 U.S. 162, 90 S.Ct. 309, 24 L.Ed.2d 340 (1969) (holding that an agency decision to terminate an investigation into termination or changes of rail service requires a full statement of conclusions under 49 U.S.C. § 14(1), when that termination is akin to a decision on the merits); *North Carolina Utilities Comm'n v. FERC*, 653 F.2d 655, 665–66 (D.C.Cir.1981) (interpreting *City of Chicago*).

In addition, Arctic maintains that the Commission approved the settlement in violation of applicable settlement rules, *see* 18 C.F.R. § 385.602(h) (Rule 602(h)), and this court's opinion in *United Municipal Distributors Group v. FERC, supra*, 732 F.2d 202. As Arctic sees it, the Commission could not approve the settlement as uncontested when, unlike the party in *United*, Arctic was contesting the entirety of the settlement and not seeking to benefit from the agreement at all. According to Arctic, the Commission was obliged under these circumstances to carry on with the proceeding and adjudicate the issues raised by its objections.

## III

We understand fully Arctic's frustration with the labyrinthine regulatory process in which it has participated.[10] We also ac-

---

**9.** Arctic makes much out of its assertion that FERC, contrary to principles of standing, required Arctic to be "particularly aggrieved"— meaning highly or extraordinarily aggrieved—in order to challenge the settlement. We believe the more natural reading of the Commission's language is that Arctic must be *individually* aggrieved. This usage of the word "particular" is of course common; such a reading eliminates any potential problem with the Commission's

treatment of Arctic within its own standing requirements.

**10.** Intervenors strenuously urge that Arctic has no standing to challenge the settlement because, in their view, Arctic has suffered no present aggrievement. We disagree. Like our colleagues who resolved the motion to dismiss, we conclude that the allegations of present injury on the part of Arctic suffice to satisfy the Hobbs Act jurisdictional (and the separate constitution-

knowledge the force of some of its arguments. But, upon analysis, we have been unable to discern any insurmountable impediment to the Commission's actions in this case. What is more, substantial public-interest considerations undergird FERC's approval of the settlement of these extraordinarily complex and burdensome proceedings.

■ At the outset of our analysis, we pause to state the obvious: this dispute is entirely about a FERC-approved settlement. Of critical importance to this case, therefore, are the Commission's rules governing settlements.[11] Those rules are, unhelpfully for Arctic, quite broadly worded. Of particular breadth is the operative provision before us, namely Rule 602(h)(1)(ii)(B). That provision states in rather sweeping terms that when confronted with a contesting party to a settlement, the agency may take such "action which the Commission determines to be appropriate." Rule 602(h)(1)(ii)(B). The breadth of discretion trumpeted by that provision is manifest. And thus it was that the rule was construed in *United* to permit the Commission

to sever a contesting party from the proceedings and to treat the matter as uncontested, so long as a forum was provided to resolve the dissenter's challenge. Thus, both the wording of the rule and its construction by this court are quite generous and flexible.

Arctic's retort is simple and straightforward: it is inappropriate and indeed unlawful for FERC not to assure just and reasonable rates.[12] This duty is all the more acute, Arctic contends, when so much water has flowed over the litigation dam. Although this argument is hardly without force, we are nonetheless unable to discern in either the statute's language or its structure an absolute command in the form Arctic would have it.

The Commission did, after all, consistently treat this proceeding as a hearing and investigation under sections 15(7) and 15(1) of the Act.[13] Those provisions confer broad discretion upon the Commission to structure its proceedings as it sees fit. For example, the Commission enjoys unreviewable discretion to determine whether to ini-

al) requirements of injury in fact necessary to accord a party standing. In particular, Arctic persuasively contends that excessive present and future tariffs adversely affect both the wellhead value of its oil, and its lease bonus and royalty interests. Although Intervenors challenge the "extent" of this injury, emphasizing the recent decline in world oil prices, they have failed to persuade us that our colleagues erred in discerning a sufficient present injury to satisfy jurisdictional prerequisites. *See* Order Denying Motion to Dismiss in No. 86–1115 (D.C.Cir. July 14, 1986) (Edwards and Bork, JJ.).

**11.** Arctic has not questioned the validity of the Commission's settlement rules under the statute. Rather, Arctic maintains that the rules cannot be applied so as to gut what it views as FERC's statutory mandate.

**12.** In particular, Arctic contends that this court's decision in *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486 (D.C.Cir.1984), requires the Commission to establish just and reasonable rates. Our holding today is in no wise inconsistent with *Farmers Union.* For that case held that once the Commission endeavors to set rates and adopts a methodology for setting those rates, the "just and reasonable" standard of the statute mandates that the Commission consider broad statutory purposes, alternatives

to its methodology, and the like; the Commission may not set rates, and then choose not to substantially justify its choice as consistent with the statute's requirements. Here, the Commission has assuredly *not* set any rates, nor has it determined on the merits that any rates are "just and reasonable" within the meaning of the ICA. Thus, *Farmers Union* is unavailing to Arctic.

**13.** Arctic's position that the proceedings, from their inception, were conducted under section 13 of the ICA is belied by the Commission's initial orders in 1977. For example, in *Trans Alaska Pipeline System,* 355 I.C.C. 80 (1977) (S.A. at 1), the order initiating the investigation and suspending the initial rates, the ICC states, "[t]hese [parties] seek to invoke our power under section 15(7) of the Interstate Commerce Act...." Later, the ICC ordered "[t]hat an investigation be ... instituted ... pursuant to section 15(1) and section 15(7)...." 355 I.C.C. 80, 87 (1977) (S.A. at 1, 8). For further indications that the proceedings were conducted pursuant to section 15, see Report and Order on Pre–Hearing Conference, Investigation and Suspension Docket No. 9164, *et al.* (August 16, 1977) (S.A. at 16), and Initial Decision Phase I Issues, 10 F.E.R.C. (CCH) ¶ 63,026 (February 1, 1980) (S.A. at 33). Arctic has advanced no reason to persuade us that section 13 was ever involved in this case.

tiate section 15 investigations at all, *see Southern Ry. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), and whether to suspend challenged rates, *see Aberdeen & Rockfish R.R. Co. v. SCRAP*, 422 U.S. 289, 311, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); *Arrow Transp. Co. v. Southern Ry. Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).[14] Moreover, decisions under the ICA not to pursue an investigation once begun lie squarely within the agency's discretion, even if the initial investigation reveals that some rates, though not all, are illegal. *See generally United States v. Louisiana*, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181 (1933) (refusing to invalidate agency decision not to prescribe rates, even though some individual rates were unjust and unreasonable); *see also United States v. SCRAP*, 412 U.S. 669, 692 n. 16, 93 S.Ct. 2405, 2418 n. 16, 37 L.Ed.2d 254 (1973) (even after preliminary investigation of rate schedules and finding that they contain individually unreasonable rates, refusal to suspend rates as generally unlawful not a reviewable decision on the merits). What is more, the Supreme Court has suggested, albeit in *dicta*, that a party dissatisfied with a decision to terminate an ongoing investigation is without recourse to the courts. *See National R.R. Passenger Corp. v. National Assoc. of R.R. Passengers*, 414 U.S. 453, 462 n. 9, 94 S.Ct. 690, 695 n. 9, 38 L.Ed.2d 646 (1974).[15] This congressionally granted, judicially confirmed discretion, coupled with the general policy favoring settlement of administrative proceedings, *see United, supra*, 732 F.2d at 209; *Pennsylvania Gas & Water Co. v. FPC*, 463 F.2d 1242 (D.C.Cir.1972), lead us to the conclusion that neither the statute nor the agency's corpus of rules requires the Commission under any and all circumstances to prescribe just and reasonable rates whenever a party requests that it do so, even after administrative proceedings have been underway for some considerable time.

■ In the absence of any absolutist and rigid statutory requirement, Arctic falls back to the position that, under the particular circumstances here, the Commission was duty bound to see the case through to the end. In this regard, Arctic relies on *Minneapolis Gas Co. v. FPC, supra*, 294 F.2d 212, for support. *Minneapolis Gas*, however, is a far cry from the unique situation before us. For one thing, that case did not involve a settlement. Moreover, all that remained for the agency to do before issuing its final decision was to approve or disapprove the ALJ's initial decision. The court held, under those circumstances, that once the record is complete, and the final

---

**14.** Arctic concedes that the decisions whether to begin an investigation and whether to suspend rates are entirely discretionary. But it contends that once an investigation has begun, the Commission is bound to prescribe just and reasonable rates. Its primary statutory support is the language of section 15(7), which states that "pending such hearing and the decision thereon the the Commission ... may ... suspend" and "upon completion of the hearing and decision may by further order require the interested carrier or carriers to refund...." 49 U.S.C. § 15(7). Arctic argues that in light of this language, once the Commission has entered on an investigation, it must see it through to a decision on the merits. We cannot agree that section 15(7) so hamstrings the Commission. The language relied upon describes what the Commission *may* do when it completes an investigation; it in no way *requires* an investigation to be completed. Otherwise, even settlements to which all concerned consent would be proscribed by the statute. Moreover, the language of section 14(1) rebuts the view that every investigation must end with a decision on the merits,

for it prescribes findings of fact only if damages are awarded; in other circumstances, the Commission need only state its conclusions in writing. *See* 49 U.S.C. § 14(1). Moreover, *City of Chicago*, properly read, required a more extensive explanation under section 14(1) only in limited circumstances, namely where the termination of the investigation was akin to prescribing rates. Here, the Commission has explicitly disavowed any intention to prescribe rates.

**15.** Arctic correctly points out that this case may be read to apply only to an agency decision to terminate an investigation it realizes it ought never to have begun. *See* Reply Brief at 24 n. 58. But even on its face, this statement from *National R.R. Passenger Corp.* is consistent with *City of Chicago*, which held that an agency decision to discontinue an investigation, *if it has the effect of being a decision on the merits*, must be supported by a section 14 statement. This court, in *North Carolina Utilities Comm'n, supra*, 653 F.2d at 666, similarly interpreted *City of Chicago*.

decision is all that remains before the entire proceeding is concluded, the agency cannot at that late hour choose to terminate its investigation and successfully invoke its broad grant of discretion to shield its action.[16]

Here, the case was regrettably far from complete. True, the administrative litigation was far along; indeed, many years marked by vigorous litigation had passed. Nonetheless, the agency was not even considering, much less near the point of decision on, the reasonableness of the TSM and the rates established under it.[17] There was a long way to go, as evidenced by the State of Alaska's desire to conclude these nigh interminable proceedings through the avenue of settlement. And the settlement itself, sanctioned by the broad sweep of the Commission's rules, sets this case quite apart from *Minneapolis Gas.*

There is another factor as well. The reasonableness of rates to be charged into the 1990's (and beyond) can hardly be evaluated exclusively on the basis of a factual record that draws to a close in 1982. Indeed, Arctic undercuts its own position in this respect—that the case is now ready for final decision—by arguing that the record is now and will perforce remain "stale" (save as to the Phase II record regarding costs of TAPS construction). These factors, buttressed by the fact that *Minneapolis Gas* reserved judgment on the type of line-drawing question at issue here, *see* 294 F.2d at 215, amply warrant the conclusion that the Commission had not reached the point of no return contemplated in that case.[18] Although we readily agree that it seems odd, at least at first glance, that the Commission would elect to conclude a nine-

year long proceeding without reaching the merits, we cannot fail to appreciate the unique nature of the protracted and extraordinarily complex TAPS investigation that prompted the principal parties in the proceeding to settle the case. The very uniqueness of the proceeding and the subsequent settlement renders the Commission's action more readily understandable and defensible.

Nor does our decision in *United* rescue Arctic's position. There, as we alluded to above, a current gas ratepayer wanted to embrace a settlement agreement in a rate case while slicing out one issue (a tax treatment question) which the other parties had subsumed within the terms of the global settlement. To the dissenting ratepayer's dismay, the Commission required it to litigate its entire case, thereby thwarting its effort to have its cake and eat it too. In that setting, this court upheld the Commission's determination to make the challenger live with the consequences of an all-or-nothing choice and to litigate its rate challenge in its entirety.

Here, Arctic is, for starters, not even a current rate payer. Its interest is therefore considerably less immediate than that of the ratepayer in *United.* But in addition, the Commission has made it clear that Arctic's challenges, including its assault on the TSM, are fully preserved and can be advanced in an appropriate proceeding under section 15 or section 13. The efficacy of this future remedy is reinforced by the fact that the Commission has expressly stated that its June 27 Order is not preclusive; that whatever evidence in the record is relevant may be used in the future; and that Arctic is in no way bound by the

---

16. We further note that the FPC's termination of the investigation in *Minneapolis Gas* had the explicit effect of approving the rates as just and reasonable. *See* 294 F.2d at 214. Here, of course, FERC has explicitly stated just the opposite—that its settlement approval in no way establishes the justness or reasonableness of any rates.

17. Although at the outset of the investigation in 1977, the Commission did refer to any rate schedules that were issued while the investigation was pending, *see* 355 I.C.C. 80, 87 (1977) (S.A. at 8), the Commission's nine-year proceed-

ings did not (and could not) focus upon or have anything to do with the TSM and the rates it established.

18. This case would be much closer to *Minneapolis Gas* if after nine years the Commission simply ended its investigation and allowed the 1977 rates to stand. Here, however, the TSM and the rates established pursuant to it are unrelated to the rates initially filed in 1977; moreover, the TSM is of course the product of a settlement, which was not the setting of *Minneapolis Gas.*

settlement. *See* June 27 Order, 35 F.E. R.C. (CCH) ¶ 61,425 (S.A. at 239); *supra* text at 10. The Commission has thus safeguarded Arctic's future interest, while saying that it will not be permitted to torpedo a fair and reasonable settlement as to all who have the most direct and immediate interest in these long-lived proceedings.

In regarding the remedy provided to Arctic *in the future* as "appropriate" within the meaning of Rule 602(h)(1)(ii)(B),[19] we should make it clear that we do not unduly discount the fact that the settlement currently affects Arctic's interests. *See supra* note 10. We hold only that it is appropriate for the Commission, under the specific circumstances at hand, to serve those interests by not forcing the settlement upon Arctic and by preserving possible future challenges for a riper moment.[20] Thus, while Arctic is understandably unenamored of the prospect of beginning anew,[21] the harsh reality of long and protracted regulatory proceedings appears at times endemic to the regulatory structure that Congress has seen fit to fashion. In short, neither the statute nor the Commission's rules prevent FERC from embarking upon the course it has chosen, and thereby satisfying the manifold interests of virtual-

ly all the parties to this mammoth proceeding.

We thus are constrained to conclude that Arctic can properly be left out in the cold for the moment. But we are comforted in this unhappy conclusion by the specific reasons advanced by the Commission in approving the settlement. The Commission discerned a number of public-interest advantages flowing from the arrangement. Quite apart from bringing a merciful conclusion to the protracted litigation, the settlement's salutary features include the fact that rates have come down substantially— and continue to do so—under the TSM; that the State of Alaska has received substantial refunds redounding to the benefit of its citizens; and that, in the Commission's view, competition will be increased in the settlement's wake. Finally, it is of no little moment that the entities charged with protecting the public interest, including the State of Alaska and the Department of Justice, have heartily approved of the settlement. And, even as to Arctic, the impact of the settlement is less severe and direct than would be the impact visited upon a dissenting ratepayer (such as the

---

**19.** Rule 602(h), concerning contested settlements, provides in relevant part:

(1)(i) If the Commission determines that any offer of settlement is contested in whole or in part, by any party, the Commission may decide the merits of the contested settlement issues, if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact.

(ii) If the Commission finds that the record lacks substantial evidence or that the contested issues cannot be severed from the offer of settlement, the Commission will:

(A) Establish procedures for the purpose of receiving additional evidence before a presiding officer upon which a decision on the contested issues may reasonably be based; or

(B) Take other action which the Commission determines to be appropriate.

18 C.F.R. § 385.602(h)(1).

Arctic cannot challenge the appropriateness of severing contesting parties to a settlement; *United* disposed of that argument. Thus, Arctic must contest the "action" the Commission then took, namely relegating Arctic to a future proceeding, as inappropriate within the meaning of subsection (B).

**20.** Our conclusion in this respect is entirely consistent with *United.* That case suggested that *some* remedy is to be afforded a contesting party. Under its settlement rules, the Commission has wide latitude in determining the appropriate remedy. In view of the indirect—though assuredly real—impact of the settlement on Arctic, we are unprepared to say that the remedy of preserving future challenges lies outside the bounds of the Commission's discretion.

**21.** To be sure, it seems curious that a party who participated fully in the litigation for nine years could at the end be told that its interest is not immediate enough to challenge the settlement. But that view overlooks the difference between the Commission's liberal policies regarding participation in proceedings and its interest in ending seemingly interminable litigation, which virtually all parties are seeking to conclude. As long as the Commission provides Arctic with a meaningful remedy contemplated by the statute, FERC could choose within its sound discretion to approve the settlement (bearing in mind that the standards of Rule 602(g) must be met), especially in light of Arctic's currently less direct interest in rates than it may well have at some later time.

ratepayer in the *United* litigation) here and now.

## IV

In sum, the Commission acted within its lawful authority and sound discretion in closing a long and wearisome chapter in the saga of TAPS rate regulation. Should Arctic see fit to do so, it may return to the Commission when the impact of TAPS rates upon it is more concrete and substantial. Until that time, we can see no reason in law that the Commission should be precluded from taking "appropriate" and sensible action in approving a settlement as in the public interest, while ensuring that Arctic can avail itself of its future remedies when its interest is more fully developed.[22]

*Denied.*

---

**22.** We have considered petitioner's various other contentions and find them sufficiently lacking in merit to warrant discussion.